| | |
|---|---|
| PEGGY ELROD;<br>YVONNE BERTOLO;<br>JANINE PALMER;<br>JUSTIN PALMER; and<br>ALL SIMILARLY SITUATED PERSONS<br>WITHIN THE PROPOSED CLASS;<br><br>    Plaintiffs,<br><br>     v.<br><br>WAKEMED; WAKEMED SPECIALTY<br>PHYSICIANS, LLC d/b/a WAKEMED<br>PHYSICIAN PRACTICES; WAKEMED<br>SPECIALISTS GROUP, LLC d/b/a<br>WAKEMED PHYSICIAN PRACTICES;<br>ARGOS HEALTH, INC.; ALLSTATE<br>PROPERTY AND CASUALTY<br>INSURANCE COMPANY;<br>PENNSYLVANIA NATIONAL MUTUAL<br>INSURANCE COMPANY; UNKNOWN<br>DEFENDANTS 1-25;<br><br>    Defendants. | AMENDED COMPLAINT FOR<br>DECLARATORY JUDGMENT, ACTION<br>TO SET ASIDE CONTRACTS AND CLASS<br>ACTION CLAIMS AGAINST THE<br>DEFENDANTS<br>JURY TRIAL REQUESTED |

## INTRODUCTION TO THE CASE

NOW COME PLAINTIFFS, by and through their attorneys, and submit this Amended

Complaint in the above-captioned Class Action lawsuit as a matter of course pursuant to Fed. R.

Civ. P. 15(a) and consistent with Plaintiffs' Motions for Extension of Time, filed October 1, 2020

and October 20, 2020, the latter causing an Order to be issued on October 20, 2020, granting

Plaintiffs up to and through November 17, 2020 to respond or otherwise plead.   Plaintiffs Janine

Palmer and Justin Palmer now join Plaintiffs Peggy Elrod and Yvonne Bertolo ("Plaintiffs"), all

of whom bring this class action on behalf of themselves and other similarly-situated individuals

against the Defendants. Plaintiffs seek for this Court to appropriately strike and set aside certain contractual provisions that are surreptitiously included within "general consent" forms requiring a signature for emergency medical treatment, in accordance with North Carolina's Uniform Declaratory Judgement Act (NCUDJA).[1] Lastly, Plaintiffs bring the additional causes of action and claims for relief below against Defendants WakeMed and Argos Health, Inc.

PARTIES

1. Yvonne Bertolo ("Plaintiff Bertolo") is a citizen and resident of Franklin County, NC and has been for at least six-months prior to the filing of this action.

2. Peggy Elrod ("Plaintiff Elrod") is a citizen and resident of Franklin County, NC and has been for at least six-months prior to the filing of this action.

3. Janine Palmer ("Plaintiff Palmer") is a citizen and resident of Wake County, NC and has been for at least six-months prior to the filing of this action. Janine Palmer is the mother of Justin Palmer and purchased the automotive insurance policy at issue in this Complaint.

4. Justin Palmer is a citizen and resident of Wake County, NC and has been for at least six-months prior to the filing of this action. Justin Palmer was a minor at the time of his accident and was a named beneficiary to his mother's automotive insurance policy at issue in this Complaint.[2]

5. Upon information and belief, Defendant WakeMed (hereinafter "WakeMed") is a non-profit corporation organized under the laws of North Carolina with a principal place of business located in Wake County, NC, and provides healthcare services to at least three emergency rooms in Wake County, NC.

---

[1] Allstate Property and Casualty Insurance and Penn National Mutual Insurance Company are named Defendants to this action solely for purposes of Declaratory Judgment as to the parties' rights under N.C. Gen. Stat. §§ 1-253 to 1-267 (2020).

[2] Justin Palmer is a named Plaintiff in this action as an interested party for purposes of Declaratory Judgment.

6. Upon information and belief, Defendants WakeMed Specialty Physicians, LLC, d/b/a WakeMed Physician Practices (hereinafter "WakeMed Physicians"), SOSID Number 108213, is a non-profit corporation organized under the laws of North Carolina with a principal place of business located in Wake County, NC, and provides healthcare services to at least three emergency rooms for WakeMed.

7. Upon information and belief, Defendant WakeMed Specialists Group, LLC, d/b/a WakeMed Physician Practices (hereinafter "WakeMed Physicians"), SOSID 1830254, is a non-profit corporation organized under the laws of North Carolina with a principal place of business located in Wake County, NC, and provides healthcare services to at least three emergency rooms for Defendant WakeMed.

8. Both WakeMed Specialty Physicians, LLC d/b/a WakeMed Physician Practices and WakeMed Specialists Group, LLC, d/b/a WakeMed Physician Practices have an assumed name of WakeMed Physician Practices and shall hereinafter be referred to as WakeMed Physicians individually and together as a group.

9. Upon information and belief, all Defendants WakeMed and WakeMed Physicians to this lawsuit are inextricably affiliated with one another for purposes of this lawsuit; all are corporate citizens of North Carolina; all are engaged in the healthcare service industry; and together, operated at least three emergency medical departments at all times relevant to this Complaint (jointly and collectively: "Defendant WakeMed" or the "WakeMed Defendants").

10. Upon information and belief, Defendant Argos Health, Inc. ("Argos" or "Defendant Argos") is a foreign corporation organized under the laws of Delaware with a principal place of business located in Texas. Argos is engaged in the practice of collecting insurance proceeds on

behalf of the WakeMed Defendants and other hospitals. Argos does not provide healthcare services, nor is it licensed to do so.

11. Upon information and belief, Pennsylvania National Mutual Insurance Company ("Penn National") is a foreign corporation organized under the laws of Pennsylvania and provides automotive insurance policies to citizens of North Carolina. Penn National issued the automotive insurance policy to Plaintiff Elrod that is the subject of this Complaint.

12. Upon information and belief, Allstate Property and Casualty Company ("Allstate") is a foreign corporation organized under the laws of Illinois and provides automotive insurance policies to citizens of North Carolina. Allstate issued the insurance policies to Plaintiffs Bertolo and Janine Palmer that are the subjects of this Complaint.

13. Unknown Defendants 1-25 represent any potential Defendants whose identity becomes known through discovery and whose actions, omissions, or course of conduct requires them to be joined as parties to this lawsuit.

<u>JURISDICTION AND VENUE</u>

14. Plaintiffs incorporate paragraphs 1 through 13 of this Complaint as if fully restated herein.

15. On July 2, 2020, Plaintiffs Bertolo and Elrod initiated this action in Wake County Superior Court by filing a Complaint, File Number: 20 CVS 7327.

16. On July 28, 2020, the WakeMed Defendants filed a Notice of Removal in the United States District Court for the Eastern District of North Carolina.[3]

17. On August 26, 2020, Plaintiffs filed a Motion to Remand this lawsuit back to Wake County Superior Court with an accompanying Memorandum of Law, contending the District Court lacked proper jurisdiction over this matter.

---

[3] All the named Defendants have been properly served with Summons and Complaint.

18. Jurisdiction of this lawsuit has not yet been heard or decided upon by the Federal District Court. Therefore, at the time of filing this Amended Complaint, jurisdiction is proper in the District Court in which the Notice of Removal was filed.

19. Notwithstanding, Plaintiffs contend this lawsuit is not proper for District Court and is better suited for the Court in which it was originally filed: Wake County Superior Court; wherein jurisdiction is proper in accordance with N.C. Gen. Stats. §§ 1-75.4 and 1-82.

20. Counsel for Plaintiffs further certify that this Amended Complaint is brought in good faith and contend that the claims and allegations made, in either the Original Complaint or this Amended Complaint, are insufficient to confer jurisdiction upon the District Court.

AGENCY ALLEGATIONS

21. Plaintiffs incorporate paragraphs 1 through 20 of this Complaint as if fully restated herein.

22. Upon information and belief, Defendant WakeMed and Defendant Argos have a contractual relationship that began sometime around 2017. Defendant Argos' website advertises itself as a "Motor Vehicle Accident/Third Party Liability Complex Claims Revenue Recovery Service" that has developed an "automatic claim assignment" process based upon a "proprietary predictive analytics model" in order to maximize a hospital's revenue.[4] Defendant Argos purportedly has a team of expert attorneys with significant experience in complex litigation who participate substantially in the manipulation of hospitals' patient registration processes, including the review and revision of forms such as the "general consent" form at issue in this lawsuit.[5]

---

[4] Defendant Argos Health's Website, accessible at: http://complexclaims.com/motor-vehicle-accident-claims/ (last visited Sept. 30, 2020).

[5] *Id.* ("In addition, we will also review and suggest edits to our clients' assignment of benefits form to enhance prompt payment directly to the provider from all available sources.").

23. Prior to Argos' relationship with Defendant WakeMed, WakeMed used a valid general consent form that performed functions required and permissible by law. *See* <u>WakeMed General Consent Form</u>, Rev. 4/15, attached as ***Exhibit 1***. This now-revised general consent form served to obtain patients' consent for emergency medical treatment and legally imposed a duty upon the patient to facilitate the hospitals' reimbursement for the reasonable value of the healthcare services rendered from patients' primary health insurance, and damages received from a potential tortfeasor. *Id.* This general consent form said nothing about assigning medical payments ("Med Pay") under an automotive insurance policy. *Id.*

24. Also prior to Argos's contractual relationship with Defendant WakeMed, WakeMed implemented measures during the patient registration process that afforded emergency room patients a choice whether to use their automotive insurance benefits to assist them with bills incurred at the emergency room. This was achieved, most notably, by *not* embedding unnecessary contractual provisions within a "general consent" form that required the patient's signature in order to receive emergency medical treatment.[6]

25. Soon after Argos' contractual relationship with Defendant WakeMed began, WakeMed began to employ a revised "general consent" form containing much of the same verbiage as their previous general consent form, but embed unnecessary contractual provisions[7] within the otherwise-valid general consent form clauses, purporting to effectuate the following:  (1) Irrevocably assign the patient's medical payment and UI/UIM insurance coverages to WakeMed; (2) Grant the hospital sole discretion over the authorization or payment of any overpayment on the

---

[6] Upon information and belief, other emergency rooms across the state, after ascertaining that automotive insurance may provide benefits, give emergency room patients a separate form or pamphlet containing information about how, and whether, to involve their automotive insurance agreements at a later date.

[7] "Principles of general contract law determine whether an assignment is valid." *Alaimo Family Chiropractic v. Allstate Ins. Co.*, 155 N.C. App. 194, 197, 525 S.E.2d 491, 495 (2002).

patient's account; and (3) Grant the hospital the right to seek and perfect a lien against the patient's Med Pay. *See* WakeMed General Consent Form, Rev. 8/17, attached as ***Exhibit 2***.

26. From the beginning of the patient registration process at Defendant WakeMed's emergency room, Defendants WakeMed and Argos become nearly indistinguishable for purposes of emergency room billing.

<u>GENERAL ALLEGATIONS OF LAW AND FACT</u>

27. Plaintiffs incorporate paragraphs 1 through 26 of this Complaint as if fully restated herein.

28. The gravamen of this Amended Complaint is centered upon Defendants WakeMed and Argos' systematic targeting of emergency room motor vehicle accident patients, whose mental and physical faculties are inherently compromised, to exploit their rights and benefits under separate and distinct automotive insurance contracts that Defendants are not otherwise entitled to.

29. Defendants' common scheme is primarily achieved by surreptitiously embedding unnecessary contractual provisions within a supposedly routine "general consent" form that must be signed as a prerequisite for emergency medical treatment. Once signed, Defendants obtain the right to collect insurance proceeds they would not otherwise be entitled to: Medical payments ("Med Pay") and Uninsured/Underinsured Motorist ("UI/UIM")[8] coverage under automotive insurance contracts.

30. Notably, the contractual provisions embedded within the "general consent" forms are presented to emergency room patients[9] in such a way that they have no choice *but* to sign them.

---

[8] UI/UIM coverage becomes subject to statutory liens upon settlement and/or civil judgement. The "general consent" forms at issue, however, purport to grant Defendants WakeMed and Argos rights to UI/UIM by way of assignment (*i.e.,* before statutory liens come into effect), thus circumventing the N.C. Lien Statutes. *See*, N.C. Gen. Stats. §§ 44-49 through -50.1. *See also*, North Carolina Financial Responsibility Act, N.C. Gen. Stat. § 20-279.21(b).

[9] As used throughout this Complaint, references to patients signing the "general consent" forms at issue includes those persons who are authorized to sign on behalf of the patient in accordance with N.C. Gen. Stat. § 90-21.13(c).

In effect, the emergency treatment sought by patients is conditioned upon them signing away their rights and benefits under their automotive insurance contracts.

31. Subsequently, Defendant WakeMed generates an itemized invoice for emergency services rendered to patients at its undiscounted[10] rate, and sends this invoice, along with the "general consent" form, to patients' automotive insurance providers to severely diminish or fully exhaust patients' Med Pay coverage. In effect, this course of conduct precludes the insureds from receiving the benefits of their automotive insurance coverages, for which they paid additional premiums.

32. Additionally, Defendants WakeMed and Argos, through provisions in the revised "general consent" form, purport to reserve themselves the right to seek and perfect a lien against the full and undiscounted amount of the patients' charges if any claim or lawsuit is filed with the patient's automotive insurance or the automotive insurance of an alleged tortfeasor,[11] with blatant disregard to any payments, discounts, or adjustments already made on behalf of the patient.

33. Aside from the ethically bereft nature of conditioning emergency medical treatment on a patient signing contractual provisions under the guise of a "general consent" form, the contractual clauses fly in the face of North Carolina's statutory lien laws, public policy directives, and the Motor Vehicle Financial Responsibility Act ("FRA") within N.C. Gen. Stat. § 20-279.21 *et. seq.*

34. North Carolina's statutory lien laws provide for a "lien upon any sums recovered as damages for personal injury in any civil action in this State." N.C. Gen. Stat. § 44-49(a).

---

[10] A patient's entitlement to be charged at a discounted rate derives from contractual agreements between hospitals and insurance companies, whereby, in essence, the hospitals agree to charge an insurer's insureds at a discounted rate in exchange for the hospital being an "in-network" provider to the insurer's insureds.

[11] Exhibit 2, Paragraph No. 9: "I, for myself and the patient, voluntarily and irrevocably agree that, if any claim or lawsuit is made against any liability, medpay, uninsured, or underinsured motorist coverage(s) related to injuries/loss for which I received care at any WakeMed or WPP location, WakeMed may seek and perfect a lien against said claim and/or recovery to the fullest extent allowed by law and may seek payment of its full and undiscounted charges from any and all proceeds to be paid from any of the insurance coverage set out above."

35. Med Pay is not a sum recovered as damages for personal injury. Rather, Med Pay is an optional, no-fault, first-party coverage that is exempt from any statutory liens contemplated by N.C. Gen. Stats. §§ 44-49 through -50.1. *Justice v. Mission Hosp., Inc.*, 2019 NCBC LEXIS 22, 21, n.1 ("The Court understands that a statutory lien would be limited to third-party insurance rather than first-party coverages.").

36. Med Pay does not become liability insurance just because it is included within an automobile liability insurance policy.

37. The syntax used in the "general consent" form at issue recognizes that Med Pay is not liability insurance by separating it from other forms of purported liability insurance listed.[12]

38. Therefore, without a valid assignment, Defendant WakeMed and Argos have no entitlement to patients' Med Pay.

39. Med Pay is intended to assist the insured, the insured's family, and passengers in the insured's vehicle at the time of the accident to pay for a myriad of medical expenses, including, but not limited to: co-pays, deductibles, prescription medications, over-the-counter medications, orthopedic devices, and funeral expenses.[13]

40. Med Pay is a contractual benefit between an automotive insurance company and its insured. As such, Med Pay may only be assigned under circumstances proper for two parties to enter into an enforceable contract.

---

[12] Exhibit 2: Paragraph 6: "Benefits assigned shall include, but may not be limited to, major medical insurance, liability insurance (including excess, umbrella and automobile [UI/UIM] coverages), medpay and personal injury protection (PIP) benefits.

[13] *See* North Carolina Dept. of Insurance: "A Consumer's Guide to Automobile Insurance" (2019). *accessible at*: http://www.ncdoi.com

41. Additionally, the contractual assignment within the "general consent" form also purports to assign patients' UI/UIM[14] insurance coverages, which operates to circumvent North Carolina's lien statutes to secure a larger portion of funds than WakeMed Defendants are entitled to under N.C. Gen. Stats. §§ 44-49 through -50.1.

42. Defendants WakeMed and Argos' course of conduct with respect to patients' automotive insurance coverages attempts to reduce the amount of compensation afforded to automotive accident victims in violation of the, "Avowed purpose of the Financial Responsibility Act," which is, "to compensate innocent victims of financially irresponsible motorists." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 573-74, 573 S.E.2d 118, 120 (2002). Moreover, the Financial Responsibility Act is, "to be liberally construed so that the beneficial purpose intended by its enactment may be accomplished." *South Carolina Ins. Co. v. Smith*, 67 N.C. App. 632, 636, 313 S.E.2d 856, 860 (1984).

43. Similarly, collecting from a patient's automotive insurance benefits at the undiscounted rate, regardless of bills paid from other sources of insurance, reduces the amount payable to the patient and decreases a patient's incentive to settle a claim, contravening, "the well-established public policy of this state favoring settlement of claims. *E.g.*, *North Carolina Baptist Hosp's., Inc., v. Mitchell*, 323 N.C. 528, 533, 374 S.E.2d 844, 848 (1988).

44. Both Med Pay and UI/UIM are optional coverages[15] that the insured had the foresight to voluntarily purchase by paying increased premiums. Allowing such optional insurance benefits to be wrest from emergency room patients by hospitals and their collection agencies, would naturally

---

[14] *Hairston v. Harward*, 371 N.C. 647 821 S.E.2d 384 (2018) (holding Underinsured motorist coverage to be subject to the collateral source doctrine and cannot be used to offset a plaintiff's recovery).

[15] Uninsured motorist coverage is compulsory within auto-liability insurance contracts with minimum limits. Liability policies with limits greater than the minimum must provide a combined Uninsured/Underinsured Motorists coverage. *See*, Financial Responsibility Act, N.C. Gen. Stat. § 20-279.1

discourage North Carolina citizens from voluntarily purchasing such optional coverages, causing "a result that would have obviously deleterious consequences." *Hairston v. Harward*, 371 N.C. 647, 661, 821 S.E.2d 384, 394 (2018).

PLAINTIFFS' PROPOSED CLASS

45. Plaintiffs incorporate paragraphs 1 through 44 of this Amended Complaint as if fully restated herein.

46. Plaintiffs bring this Amended Complaint as a class action pursuant to N.C. Gen. Stat. § 1A, Rule 23(a) of the North Carolina Rules of Civil Procedure on behalf of themselves and all other similarly situated individuals in North Carolina as members of the proposed class (the "Class") as defined below:

    a.  All natural persons residing in North Carolina who went to any of Defendant WakeMeds' emergency rooms seeking treatment for injuries sustained in a motor vehicle accident, including any persons presenting to Defendant WakeMeds' emergency room on behalf of a patient who is a minor or otherwise lacks capacity, who:

        i.  Signed, or had an authorized agent[16] sign, a general consent form as part of the patient registration process within three years, or in accordance with the limitations periods within the separate causes of action, however applicable, prior to the filing of this action, that contained contractual assignments purporting to:

           1.  Irrevocably assign the patient's Med Pay and UI/UIM automotive insurance coverages to the hospital;

---

[16] "Authorized agent," as used herein, denotes a person authorized to consent to treatment on behalf of a patient who lacks capacity as outlined within N.C. Gen. Stat. § 90-21.13(c).

2. Give the hospital sole discretion over the return or payment of any overpayment on the patient's account;

3. Grant the hospital the right to seek and perfect a lien against the patient's Med Pay and UI/UIM; and thereafter:

    ii. Defendant WakeMed and/or Defendant Argos represented the general consent form to the patients' automotive insurance provider as a valid assignment of benefits and thereafter collected funds directly from the patients' Med Pay benefits; or

    iii. Defendant WakeMed and/or Defendant Argos asserted and enforced a lien against a patient's Med Pay benefits.

47. <u>Exclusions from the class</u>: Excluded from the class are Plaintiffs' counsel and all employees of Plaintiffs' counsel, Defendants, in any capacity in which they have a controlling interest, to include their legal representatives, heirs, successors, agents, employees, and all judges and persons employed with the Clerks of Court in North Carolina, to the extent such exclusion lawfully applies.

48. <u>Numerosity</u>: The Proposed Class members are so numerous that joinder of its members is impractical. Upon information and belief, Defendant WakeMed and Argos have committed the course of conduct described herein with respect to hundreds, if not thousands, of patients whose names and addresses are identifiable through documents maintained by these Defendants.

49. <u>Existence and Predominance of Common Questions of Law and Fact:</u> Virtually all issues of law and fact in this Class Action are common to the Proposed Class and include the following:

a. Whether the same or similar agreements entered into by the Class under the circumstances described herein are illegal, unconscionable, and/or antithetical to public policy;

b. Whether the same or similar agreements entered into by the Class, under the circumstances, are otherwise voidable and without effect based on defenses of fraud, constructive fraud, fraud in the inducement, duress, unilateral mistake, imposition, and lack of any meaningful choice by the Plaintiffs;

c. Whether contractual provisions embedded within a "general consent" form that must be signed by an emergency room patient in order to receive emergency medical treatment are presumed valid under North Carolina law;

d. Whether the same or similar agreements entered into by the Class in order to receive emergency treatment lack consideration because of Defendant WakeMed's preexisting duty to provide emergency treatment, statutorily imposed by federal law, under the Emergency Medical Treatment and Labor Act, codified within 42 U.S.C. § 1395dd (2020) ("EMTALA");

e. Whether the Defendant's conduct, as described herein, exceeds the permissible bounds of an assignment of proceeds, but constitutes an assignment of claim in promotion of champerty;

f. Whether the Defendants' conduct, as described herein, resulted in a breach of fiduciary duty, fraud, constructive fraud, fraud in the inducement, and was grossly negligent as it applies to the class members;

g. Whether the Defendants' conduct constitutes Unfair and Deceptive Trade Practices in or affecting commerce in North Carolina in violation of N.C. Gen. Stat. §§ 75-1 *et. seq*.

50. <u>Adequacy</u>: The Plaintiffs are adequate representatives of the Proposed Class and their interests are aligned with, and not antagonistic to, the interests of the Class they seek to represent. The Plaintiffs have retained counsel competent in complex litigation who will fairly and adequately protect the interests of all Class members.

51. <u>No Conflict of Interest and Genuine Personal Interest</u>: There are no conflicts of interest between the named representatives and members of the class, and the named representatives have a genuine personal interest, and not a mere technical interest, in the outcome of this action.

52. <u>Damages</u>: To the extent the damages of the class members have slight variations, it is based solely on the amount of automotive insurance Med Pay that was improperly taken from them by Defendants. The damages of the individual class members can be obtained by determining the amount of Med Pay coverage taken from each class member.

53. <u>Predominance and Superiority</u>: A class prosecution of this action predominates over all questions of law and fact common to each individual member of the class and is superior to other available methods for the effective and efficient administration of justice. If the individual class members represented themselves it would result in an overwhelming, burdensome, and expensive drain to the judicial economy of the courts and litigants, and presents a strong potential for inconsistent and/or contradictory judgments regarding the legal and factual issues presented in this action. Moreover, this class action will result in substantial benefits to the litigants and the courts by resolving the numerous individual claims in one setting, and by allowing one Court to address

the facts and law in this action that have far-reaching consequences affecting all citizens and residents of North Carolina in the future.

## THE REPRESENTATIVE PLAINTIFFS' CLAIMS

54. Plaintiffs incorporate paragraphs 1 through 53 of this Complaint as if fully restated herein.

55. On October 15, 2019, Plaintiff Bertolo was involved in a motor vehicle accident (MVA) and sought treatment that same day at one of the WakeMed Defendants' emergency rooms for injuries she sustained in the accident.

56. Upon arrival, Plaintiff Bertolo was in severe pain, reported a foggy memory surrounding the MVA and uncertainty as to whether she had lost consciousness as a result of the collision.

57. At that time, Plaintiff Bertolo had a motor vehicle insurance policy through Allstate that included Med Pay coverage of $2,000.

58. During the registration process at Defendant WakeMed's emergency room, Plaintiff Bertolo was directed to sign numerous documents and forms that were visible only on the WakeMed employee's computer screen, whereby the employee briefly mentioned to Plaintiff Bertolo what each form was, and directed her to sign by way of an electronic signature pad similar to the device depicted in *Exhibit 3.*

59. One of the electronic documents signed by Plaintiff Bertolo at Defendant WakeMed's emergency room was the "general consent" form giving rise to this action, attached as *Exhibit 4.*

60. Afterward, Defendant WakeMed generated a list of undiscounted charges against Plaintiff Bertolo totaling $8,571.60 for her emergency room treatment that day.

61. On November 4, 2019, Defendant Argos, representing itself as an agent of WakeMed, faxed a claim on behalf of Plaintiff Bertolo to Allstate, stating in pertinent part: "Attached is a

fully-executed, irrevocable Assignment of Benefits and the UB(s)[17] necessary to process a claim for any Med Pay/PIP coverage. Please also note that WakeMed and WakeMed Specialty Physicians is asserting a lien under N.C.G.S. 44-49 & 44-50."

62. On November 15, 2019, Allstate, after intervention by Plaintiff's Counsel, issued a check for $2,000 to Defendant WakeMed c/o Plaintiff's Counsel, completely exhausting Plaintiff Bertolo's Med Pay coverage and making the check worthless to her.

63. On April 5, 2019, Plaintiff Elrod was involved in a MVA and sought treatment that same day at one of Defendant WakeMed's emergency rooms.

64. At that time, Plaintiff Elrod had a motor vehicle insurance policy with Penn National that included Med Pay coverage of $5,000.

65. When Plaintiff Elrod arrived at Defendant WakeMed's emergency room, she was terrified and in a panicked state because of potential internal bleeding complications stemming from her single-lead pacemaker and blood-thinning medication; complications posing a significant threat to life or function.

66. Notwithstanding, and much like Plaintiff Bertolo, Plaintiff Elrod was presented with numerous forms that needed to be signed in order for her to receive emergency medical treatment. Most of these forms were not presented to her in paper format, but rather were merely pulled up on Defendant WakeMed's employee's computer screen as the employee briefly mentioned what each form was, and directed Plaintiff Elrod to sign the electronic signature pad.

67. One of the electronic documents signed by Plaintiff Elrod at Defendant WakeMed's emergency room during this process was the "general consent" form giving rise to this action, attached as *Exhibit 5.*

---

[17] UB stands for Uniform Billing Form.

68. Defendant WakeMed generated charges at the undiscounted rate totaling $19,314.48 for Plaintiff Elrod's emergency treatment on the day of the accident.

69. On April 25, 2019, Defendant Argos, representing itself as an agent of WakeMed, faxed a claim on behalf of Plaintiff Elrod to Penn National for the $20,065.48,[18] stating in pertinent part: "Attached is a valid North Carolina Lien, UB's for med pay/PIP coverage, and an executed Assignment of Benefits."

70. On April 26, 2019, Penn. National issued a check for $5,000 to WakeMed and WakeMed Specialty Physicians, completely exhausting Plaintiff Elrod's coverage under the Med Pay provisions in her motor vehicle insurance policy.

71. On April 26, 2019, Justin Palmer was seventeen years old and driving a vehicle with two of his friends inside when another vehicle severely T-boned Justin's vehicle in an intersection, rendering Justin unconscious and bleeding as his friends pulled him from the mangled vehicle.

72. At the time of the accident, Justin Palmer was a named insured on his mother's automotive policy issued through Allstate that contained $1,000 of Med Pay coverage, payable to the insured and each passenger in Justin's vehicle.

73. Upon receiving a phone call, Justin Palmer's mother, Janine Palmer, rushed to the scene of the accident and witnessed her son bleeding from his head, while EMS personnel applied a neck brace before loading him onto a gurney, strapping him down, and loading him into an ambulance. Thereafter, Plaintiff Janine Palmer rode in the back of the ambulance with Justin to Defendant WakeMed's emergency room while EMS personnel administered immediate treatment. Photos of the accident scene and injuries incurred by Justin Palmer are attached as *Exhibit 6*.

---

[18] Plaintiff visited Defendant WakeMed's emergency room again on April 22, 2019 for emergency medical care believed to be a result of the accident and was charged $751.00 for this visit. Defendant WakeMed generated charges in the amount of $19,314.48 for Plaintiff Elrod's initial emergency room visit on the day of the accident.

74. Upon arrival at Defendant WakeMed's emergency room, Mrs. Palmer witnessed WakeMed's employees cut off her son's clothing and begin to remove the shards of glass embedded in Justin's arm, shoulder, and head.

75. Mrs. Palmer was then escorted to a small room by an employee of Defendant WakeMed and was directed to sign numerous patient registration documents while her son was being treated in an adjacent room.

76. Defendant WakeMed's employee also brought a Clergyman into the room while Mrs. Palmer was signing the documents, whose presence alone greatly intensified Mrs. Palmer's anxiety and gravity of the critical emergency medical treatment her son required in the adjacent room.

77. At the time Mrs. Palmer signed the numerous documents at the direction of Defendant WakeMed's employee, she was in a state of complete panic and signed the documents under the belief that time was of the essence and any delay in signing the forms would delay her son's critically needed treatment.

78. The "general consent" form at issue in this case was among these documents that Mrs. Palmer signed and is attached as *Exhibit 7.*

79. At no time was Mrs. Palmer made aware that signing this form would effectively forfeit the rights and benefits under her automotive insurance policy for which she voluntarily paid increased premiums to receive.

80. Subsequently, Defendants represented this "general consent" form, signed by Mrs. Palmer, to Allstate as a valid assignment of benefits in order to exhaust Plaintiff Palmer's Med Pay coverage.

## FIRST CAUSE OF ACTION:
### Declaratory Judgement Against All Defendants

A.     Consent for Treatment v. Elements of a Valid Contract:

81. Plaintiffs incorporate paragraphs 1 through 80 of this complaint as if fully restated herein.

82. Plaintiffs certify there is an actual and ongoing controversy between the parties to this action concerning the "general consent" forms at issue and Defendants WakeMed and Argos's commandeering of Plaintiffs' first-party insurance benefits, voluntarily purchased through their respective automotive insurance carriers.

83. Plaintiffs to this action have standing to bring an action for Declaratory Judgment under North Carolina's Uniform Declaratory Judgment Act ("NCUDJA"), codified within N.C. Gen. Stats. §§ 1-253 to 1-267 (2020).

84. Plaintiffs seek to have this Court adjudicate the genuine controversies between the parties in accordance with the NCUDJA and determine the rights, status, and property of Plaintiffs as applied to the construction, validity, and circumstances surrounding the contractual assignments giving rise to this action, relative to the statutes and laws of North Carolina.

85. Paragraphs numbered 6-9 of the "general consent" form within ***Exhibit 2*** are subject to contract law: "Principles of general contract law determine whether an assignment is valid." *E.g.*, *Alaimo*, 155 N.C. App. at 197, 525 S.E.2d at 495.

86. Defendants WakeMed and Argos have drafted their "general consent" form in such a way that confounds and obscures the different standards applicable to the mental capacity required for a patient to give consent for diagnosis and treatment and the elements required to legally create a valid and enforceable contractual assignment.

87. Consent for medical treatment shields medical providers from liability, is subject to a "reasonable person" standard, and can be provided by either the patient or a host of "authorized persons," ranging from a patient's guardian to a friend of the patient. N.C. Gen. Stat. § 90-21.13.

88. A patient's consent to receive emergency medical treatment and the concomitant duty to repay for services received is not contractual and thus does not require the elements necessary for a valid contract. Rather, the amount owed by the patient to the hospital creates an account[19] receivable, best described as a health-care-insurance receivable. N.C. Gen. Stat. § 25-9-102(46).[20] Although this duty to repay is not contractual in nature, its imposition is legal and permissible as applied to emergency medical treatment because hospitals are entitled to reasonable reimbursement for services rendered and because it has traditionally served the public policy interest to eliminate the practice of "patient dumping."[21]

89. In contrast, "[t]he well-settled elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *E.g.*, *Se. Caissons, LLC. v. Choate Constr. Co.*, 247 N.C. App. 104, 110, 784 S.E.2d 650, 654 (2016).

90. Plaintiffs have been injured by the Defendants' actions and move to have certain contractual provisions within the "general consent" form deemed illegal, void, and to be set aside or rescinded for reasons including, but not limited to: unconscionability; lack of mutual assent; lack of consideration; unilateral mistake, fraud, imposition, and public policy. Specifically, Plaintiffs challenge the validity of the following paragraphs, numbered 6 through 9 in ***Exhibit 2***:

---

[19] N.C. Gen. Stat. § 25-9-102(2): "The term ['Account'] includes health-care-insurance receivables."
[20] N.C. Gen. Stat. § 25-9-102(46): "'Health-care-insurance-receivable' means an interest in or claim under a policy of insurance which is a right to payment of a monetary obligation for health-care goods or services provided."
[21] Patient dumping is "a statutorily imposed liability that occurs when a hospital capable of providing the necessary medical care, transfers a patient to another facility or simply turns the patient away because of the patient's inability to pay for services…" International Risk Management Institute, Inc. (IRMI) (November 17, 2020, 11:45 AM), https://www.irmi.com/term/insurance-definitions/patient-dumping.

(6-7) Irrevocable Assignment of Insurance Benefits; (8) Overpayments and Refunds; and (9) Assertion of Lien.

    B.      Unconscionability of the Contracts

91. In support of Declaratory Judgment on the contractual provisions within the "general consent" forms in the case *sub judice*, Plaintiffs incorporate their respective allegations within paragraphs 54-80 as if fully restated herein, and further contend:

> Regardless of whether the "general consent" form was presented electronically as with Plaintiffs Bertolo and Elrod or presented in paper format as with Plaintiff Palmer, none of the hospital's employees pointed out, informed, told, or otherwise indicated to Plaintiffs that they were signing away their rights to their Med Pay under their separate automotive insurance contracts. Further, the terms of these "general consent" forms were at the very least, one-sided and contrary to public policy. As such, these "general consent" forms were both procedurally and substantively unconscionable.

>     a.   Plaintiffs Bertolo and Elrod contend that if they had known, or been made aware, of the contractual provisions and their effect within the "general consent" form, they would not have known what to do: In substance, they went to the emergency room for emergency medical treatment after a car accident and were required to sign this "general consent" form to receive that treatment; However, there was no feasible way for either patient to provide their consent for diagnosis and treatment without *simultaneously* signing away their rights under their respective automotive insurance policies.

>     b.   Plaintiff Janine Palmer's account mirrors the other Plaintiffs' sentiments, but further contends that she was in such a state of shock and panic that she would have

signed anything she was directed to sign under the impending fear that any delay on her part would delay the treatment her son critically needed.

    c.   All Plaintiffs contend that they (much like any reasonable person), expected to fill out and/or sign some sort of general consent form during the registration process in order to effectuate emergency medical treatment.

    d.   All Plaintiffs further contend that they (much like any reasonable person), did *not* expect to be required to sign away their rights and benefits under their voluntarily purchased first-party optional Med Pay automotive insurance benefits in order to effectuate emergency medical treatment.

92. When Plaintiffs signed the "general consent" forms in order to receive emergency medical treatment, they were not in a position to "shop around" at different emergency rooms: Plaintiff Palmer was delivered, along with her son, to Defendant WakeMed's emergency room by an ambulance; Plaintiffs Bertolo and Elrod were both experiencing sheer panic and went to the WakeMed Defendants' emergency room because it was the closest emergency room.

93. When Plaintiffs signed the "general consent" forms in order to receive emergency medical treatment, none of them thoroughly read through the "general consent" form due to their state of mind, nor were they afforded the opportunity to do so: Plaintiffs Bertolo and Elrod were not even given the "general consent" form until after they signed the electronic signature pad; and for Plaintiff Palmer, time was of the essence for her son's treatment in the Trauma unit.

94. In the event that Plaintiffs had taken the time to read through the "general consent" forms, it is doubtful they would have understood the significance of the legal terms within the form under such circumstances: Plaintiff Bertolo was in severe pain and experiencing cognitive impairments;

Plaintiff Elrod's visit to the emergency room because her condition, presented a significant threat to life or function; Plaintiff Palmer was fearful for her son's life.

95. Moreover, had Plaintiffs attempted to dissect the legalese within Paragraph No. 9 of **Exhibit 2,** they would have likely been unable to comprehend how they could receive medical attention and retain any benefits from contractual discounts under their health insurance plans. In the "general consent" form, Defendant WakeMed endows itself with the right to charge any patient at its undiscounted rate if a claim is made with Plaintiffs' automotive insurer. Ironically, the same document gives WakeMed the right to make a claim on Plaintiffs' behalf.

96. Notwithstanding, signing these "general consent" forms at the direction of Defendant WakeMed's employees was presented as a routine step in patient registration in order to receive emergency medical treatment. Plaintiffs simply had no choice *but* to sign the "general consent" form, contractual provisions and all. As such, Plaintiffs never made an objective manifestation of their consent to the terms of the contract, rendering the contract null and void. *See Musselwhite v. Cheshire*, 266 N.C. App. 166, 831 S.E.2d 367 (2019).

97. Similarly, it is impermissibly unfeasible to claim that there was mutual assent between the Plaintiffs and Defendant WakeMed at the time they signed these "general consent" forms. Plaintiffs went to Defendant WakeMed's emergency room with the sole intent to receive emergency treatment. Plaintiffs absolutely did not intend to assign their rights and benefits under their automotive insurance policies in order to receive emergency treatment. This glaring lack of mutual assent as to the contractual provisions "agreed to" by the Plaintiffs is more than enough to invalidate the contractual provisions at issue. *See Se. Caissons*, *LLC v. Choate Constr.,* 247 N.C. App 104, 787 S.E.2d. 650 (2016).

98. Furthermore, the contractual provisions are unconscionable because they granted Defendant WakeMed the right to payment from Plaintiffs' Med Pay, a source of insurance proceeds, to which Defendants are not otherwise entitled.

99. Additionally, UI/UIM coverage automatically becomes subject to statutory liens once an insured receives compensation through settlement or a civil judgment and is not intended to be assigned–as the "general consent" form purports to do–especially if charged at undiscounted rates in an attempt to reduce amounts payable to an insured and to take a larger portion of proceeds from other lienholders, intended to be paid on a *pro rata* basis. N.C. Gen. Stat. § 44-50.1.

100. North Carolina has employed a strong public policy directive to encourage people to obtain adequate motor vehicle insurance through the Financial Responsibility Act and other measures. *E.g.*, N.C. Gen. Stat. § 20-279.21. It is axiomatic that condoning the practice of hospitals and/or collections agencies to commandeer the right to insurance proceeds to which they would not be otherwise entitled, at the expense of emergency room patients would have obvious deleterious consequences on people's willingness to purchase and pay premiums for any motor vehicle insurance above what is required by law. *See Hairston*, 371 N.C. at 661.

C. Consideration, or Lack Thereof:

101. In apparent acknowledgement of the categorically different legal standards applicable to validly obtain a patient's consent for treatment and those legal standards to create a valid and enforceable contract, the preamble of the section outlining the contractual provisions begins with, "in consideration of health care services provided…." However, this purported consideration is insufficient as a matter of law. EMTALA imposes a duty upon emergency rooms to provide emergency treatment to individuals who seek treatment at that emergency room, and under basic contract principles, "a promise to perform an act which the promisor is already bound

to perform is insufficient consideration for a promise by the adverse party." *E.g.*, *Warzynski v. Empire Comfort Systems, Inc.*, 102 N.C. App. 222, 231, 401 S.E.2d 801, 806 (1991). *See also*, 42 U.S.C. § 1395dd.

102.     Under EMTALA, an emergency room is required to, at a minimum, screen patients complaining of an emergency condition, stabilize un-stabilized patients, and when necessary, provide for a patient transfer to another medical facility. *See* 42 U.S.C. § 1395dd. *See also*, *Trivette v. North Carolina Baptist Hosp., Inc.*, 131 N.C. App. 73, 75, 507 S.E.2d 48, 51 (1998).

103.     Upon information and belief, the procedures and treatment for which Plaintiffs were billed were those emergency services contemplated by EMTALA. Plaintiffs were screened by physicians and medical equipment alike to diagnose both immediately apparent and potentially hidden serious medical conditions, and subsequent services and procedures were performed to stabilize Plaintiffs' condition until they could be safely released from the emergency room.

104.     Moreover, Plaintiffs' signatures indicating they "agreed" to the contractual provisions were procured by way of Fraud, Constructive Fraud, and Fraud in the Inducement, as described below in paragraphs 116-129, and incorporated within this paragraph as if restated herein.

105.     There is a legal presumption that a patient's consent for medical treatment, when evidenced in writing and signed by the patient, is valid. N.C. Gen. Stat. § 90-21.13(b). However, it is illogical and impermissibly absurd to extend the same presumption to contractual clauses surreptitiously embedded within "general consent" forms that are signed in emergency rooms as a prerequisite for someone to receive emergency medical treatment.

106.     Therefore, Plaintiffs request that this Court strike, allow Plaintiffs to rescind, or set aside the contractual provisions within Paragraphs No. 6-9 of the "general consent" form at issue as being illegal, void, and against public policy as a matter of law.

SECOND CAUSE OF ACTION:
Breach of Fiduciary Duty Against Defendant WakeMed

107.     Plaintiffs incorporate paragraphs 1 through 106  of this Complaint as if fully restated herein.

108.     When Plaintiffs sought emergency treatment at Defendant WakeMed's emergency room, Defendant WakeMed's employees appeared to be in a position of dominance and control over whether to provide, or withhold, treatment.

109.     Upon arrival, the Plaintiffs' compromised mental and/or physical states exacerbated the Plaintiffs' feelings of inferiority, resulting in their willingness to comply with any instructions and/or directions given by Defendant WakeMed's employees in charge of the patient registration process.

110.     Consequently, Plaintiffs had no choice but to repose their trust and confidence in Defendant WakeMed's employees and agents immediately responsible for the patient registration process, whom they trusted to act in Plaintiffs' best interests to effectuate emergency medical care by a treating physician.

111.     Because of the apparent superiority and influence Defendant WakeMed held over Plaintiffs at the time they presented for emergency treatment, and given Plaintiffs' diminished mental and physical states, Defendant WakeMed was bound, in equity and good conscience, to act in good faith and with due regard to the Plaintiffs' interests. *See King v. Bryant*, 369 N.C. 451, 795 S.E.2d 340 (2017).

112.     The duty of care owed by Defendant WakeMed to Plaintiffs during the registration process and the immediately subsequent treatment, constituted a physician-patient fiduciary duty, regardless of whether this duty subscribes to traditional notions of the doctor-patient relationship. *See Id.* at 462.

113.     Instead of acting in good faith as a fiduciary, Defendant WakeMed, by and through Defendant Argos, obtained Plaintiffs' signatures on the "general consent" form and procured confidential patient information, in excess of that required for treatment, in order to obtain rights to Plaintiffs' automotive insurance benefits to which Defendants were not otherwise entitled.

114.     Thereafter, Defendant WakeMed, by and through Argos, sent these "general consent" forms to Plaintiffs' respective automotive insurers and exhausted Plaintiffs' Med Pay benefits that rightfully belonged to the Plaintiffs.

115.     The Plaintiffs to this action have been damaged in excess of $25,000 as a result of the Defendants' conduct as described herein.


THIRD CAUSE OF ACTION:
Fraud; Constructive Fraud; Fraud in the Inducement Against
Defendants WakeMed and Argos


116.     Plaintiffs incorporate paragraphs 1 through 115 of this complaint as if fully restated herein.

117.     Defendant Argos markets itself as a team of expert attorneys with significant experience in complex litigation, who review and suggest revisions to a hospital's patient

registration procedures and assignment of benefits forms in order to maximize a hospital's revenue, see ***Exhibit 8***.[22]

118.     Defendant Argos' website makes clear their intent to target patients' Med Pay coverage following an automobile accident.[23]

119.     In doing so, Defendants WakeMed and Argos embedded contractual provisions within an otherwise-valid general consent form between the paragraph titled, "Consent for Diagnosis and Treatment," and the signature line.

120.     The "general consent" form, as drafted, fails to afford incoming emergency patients any option to receive emergency medical treatment while not simultaneously assigning their rights and benefits under their automotive insurance policies.

121.     The "general consent" form, as drafted, contains no indication to an intended signee that the contractual provisions embedded in the form are fundamentally and categorically different than the general consent terms required for emergency medical treatment.

122.     Upon information and belief, the registration process implemented by Defendants WakeMed and Argos does not recommend, require, or enforce any measures to ensure emergency room patients are informed of the legal implications when signing the "general consent" form, regardless if the document is presented as a hard-copy to sign (as in Plaintiff Palmer's experience), or the form is presented electronically on the computer screen of a WakeMed employee who

---

[22] Defendant Argos Health's Website, accessible at: http://complexclaims.com/motor-vehicle-accident-claims/ (last visited Sept. 30, 2020) ("In addition, we will also review and suggest edits to our clients' assignment of benefits form to enhance prompt payment directly to the provider from all available sources.").

[23] Defendant Argos Health's Website, accessible at: http://complexclaims.com/motor-vehicle-accident-claims/ (last visited Sept. 30, 2020) ("In the case of an automobile accident, we'll first attempt to collect payments via PIP/Med Pay sources…")

directs the patient sign the electronic signature pad (as was the experience of Plaintiffs Bertolo and Elrod).

123. Given the purported legal expertise of Defendants WakeMed and Argos, embedding contractual provisions within a general consent form without any procedures in place to ensure the patient is made aware of the contractual provisions, or to afford patients some kind of meaningful choice as to whether they agree to such contractual provisions, constitutes an intentional material misrepresentation and misrepresentation by omission.

124. This course of conduct by Defendants WakeMed and Argos was intended to, and did in fact, induce Plaintiffs to unknowingly sign away their rights and benefits under their respective automotive insurance policies.

125. Consequently, Plaintiffs' Med Pay benefits were quickly exhausted by Defendants, precluding Plaintiffs from benefitting from their own first-party insurance coverage in a number of ways, including, but not limited to: rendering Plaintiffs unable to make a claim with their automotive insurers, precluding Plaintiffs from being able to negotiate with lienholders, and denying Plaintiffs any meaningful choice regarding how to best use such optional insurance proceeds for which Plaintiffs paid additional premiums to receive. [24]

126. Subsequent to treatment, and as a part of Defendant Argos' regular course of business, it represented itself as an agent of Defendant WakeMed and sent Plaintiffs or their agents notices of liens representing that Defendants were entitled to a lien against the patients' Med Pay coverage in accordance with North Carolina laws including N.C. Gen. Stats. §§ 44-49 and -50, see *Exhibit 9.* Such statements are untrue and misleading: The only right Defendants could

---

[24] Although Plaintiff Palmer still had outstanding medical bills to pay on her son's behalf, Plaintiff Palmer contends she could have deposited her Med Pay benefits into her Health Savings Account ("HSA") in order to receive tax advantages concomitant with HSA accounts.

possibly have to Plaintiffs' Med Pay coverage come from the contractual assignments within the "general consent" forms at issue.

127.     Further, to the extent Defendants WakeMed and Argos used the "general consent" forms signed by Plaintiffs to assert that they had a valid assignment of benefits entitling them to Plaintiffs' Med Pay, constitutes fraudulent misrepresentation(s) to each automotive insurance carrier from which Defendants sought payment.

128.     Defendants knew, or should have known, the contractual provisions within the "general consent" form were void and unenforceable for the myriad of legal reasons stated throughout this Complaint. Conditioning emergency treatment for a patient who unknowingly signs unnecessary contractual provisions embedded within a general consent form, is quite shocking to the conscience.

129.     The Plaintiffs to this action have been damaged in excess of $25,000 and are also entitled to punitive damages as a result of the Defendants' conduct as described herein.

FOURTH CAUSE OF ACTION
Conversion against Defendants WakeMed and Argos

130.     Plaintiffs incorporate paragraphs 1 through 129 of this Complaint as if fully restated herein.

131.     Defendants WakeMed and Argos were not entitled to the Plaintiffs' Med Pay funds absent a valid assignment.

132.     For all reasons stated heretofore, the contractual provisions within the "general consent" form are invalid.

133.     Notwithstanding, Defendants WakeMed and Argos improperly took the funds to which Plaintiffs were entitled under their respective Med Pay coverages under the false-pretense

of "validly executed assignment of benefits" forms and thereafter used those funds as if they rightfully belonged to Defendants.

134.     Additionally, the previously-used general consent form within **Exhibit 1** provided for patients to be refunded any overpayments on their accounts.[25] The currently-used "general consent" form purports to endow Defendant WakeMed with sole discretion over what it can do with overpayments to a patient's account.[26]

135.     The Defendants' Conversion of Plaintiffs' Med Pay funds as described in this Complaint was performed intentionally, willfully, wantonly, and in conscious disregard for the Plaintiffs' rights.

136.     The Plaintiffs to this action have been damaged in excess of $25,000 and are also entitled to punitive damages as a result of the Defendants' conduct as described herein.

FIFTH CAUSE OF ACTION
Unfair and Deceptive Trade Practices under N.C. Gen. Stats. §§ 75-1 *et. seq.*

A.  *Unfair and Deceptive Trade Practices against Defendant Argos*

137.     Plaintiffs incorporate paragraphs 1 through 136 of this complaint as if fully restated herein.

138.     As stated above, Defendant Argos played a substantial role in crafting the "general consent" form and patient registration procedures in such a way to procure an assignment of benefits simultaneously with obtaining Plaintiffs' consent for medical treatment.

139.     Upon information and belief, Defendant Argos played a substantial role in other policies and procedures used during the patient registration process at Defendant WakeMeds' emergency room.

---

[25] *Exhibit 1*: "I understand that any remaining credit due . . . will be refunded to me."
[26] *Exhibit 2*: "I authorize return or payment of any overpayment received within WakeMed's sole discretion."

140.	Defendant Argos' self-representation as "expert attorneys experienced in complex litigation" and subsequent drafting of the "general consent" form, created the predicament Plaintiffs faced: Retain rights and benefits under a separate automobile insurance policy *or* receive emergency medical care.

141.	Defendant Argos clearly has extensive knowledge of emergency room patient registration processes and is aware that incoming patients will be required to sign general consent forms in order to receive emergency medical treatment.

142.	Defendant Argos is aware, or should be aware, that any emergency room patient is likely to be in a state of mental and/or physical impairment that would render them unfit to enter into contracts concerning any other subject matter.

143.	Notwithstanding, Defendant Argos intentionally, knowingly, deceptively, unethically, and unscrupulously embedded contractual provisions within a general consent form intended to be signed by incoming emergency room patients.

144.	Defendant Argos' inclusion of contractual provisions within a "general consent" form required to be signed by incoming patients to receive emergency medical treatment, was intended to deceive, and did in fact deceive, Plaintiffs and coerced them into assigning their optional rights and benefits under their automotive insurance contracts to which Defendant Argos is not otherwise entitled.

145.	Thereafter, Defendant Argos represented the "general consent" forms as if they were validly procured "assignment of benefits" forms to Plaintiffs' automotive insurance carriers, and collected insurance proceeds that Plaintiffs had voluntarily purchased and paid premiums for.

146.    This course of conduct exhausted Plaintiffs' Med Pay benefits and precluded them from any rights or benefits they would otherwise have had under their Med Pay coverage. Further, this conduct stripped Plaintiffs of the ability to choose how to best spend insurance proceeds to which Plaintiffs are legally entitled.

147.    On January 9, 2020, Plaintiffs' Counsel sent separate letters on behalf of Plaintiffs Elrod and Bertolo stating, in pertinent part, that engaging in a practice of having emergency room patients assign their automotive insurance Med Pay at the time of treatment is against public policy and gives rise to other legal issues. Within these letters, Plaintiffs' Counsel sought for Defendant Argos to simply return Plaintiffs' Med Pay to Plaintiffs to resolve this issue. The exchange between Plaintiffs' Counsel and Defendant Argos' Counsel is attached as *Exhibit 10.*

148.    On February 5, 2020, Plaintiffs' Counsel received a response from Defendant Argos' Counsel indicating that Argos had no intention of ceasing its engagement in such practices and that he would not recommend WakeMed void its assignment of benefits.

149.    Defendant Argos' actions unquestionably affect commerce in North Carolina because, at the very least, they targeted emergency room patients' automotive insurance within North Carolina, and North Carolina requires all drivers to be insured.

150.    Defendant Argos' meddling and manipulation of Defendant WakeMed's emergency patient registration processes and forms is the actual and reasonably foreseeable cause of patients' injuries.

151.    Defendant Argos does not provide healthcare services, nor is it licensed to do so.

152.     As an actual and proximate cause of the Defendants actions described above, the Plaintiffs to this action have been damaged in excess of $25,000 and Plaintiffs are also

entitled to punitive damages, treble damages, and attorney's fees based on Defendants unwarranted refusal to resolve the matter that is the basis of this suit in accordance with N.C. Gen. Stat. § 75-16.1, as allowed by law.

B.  *Unfair and Deceptive Trade Practices Against Defendant WakeMed*

153.    Plaintiffs incorporate paragraphs 1 through 152 of this Complaint as if fully restated herein.

154.    Defendant WakeMed's employees and/or agents are aware that the "general consent" form they directed Plaintiffs to sign did more than merely obtain Plaintiffs' consent for treatment.

155.    Defendant WakeMed's employees and/or agents are aware that the "general consent" form they directed Plaintiffs to sign contained contractual provisions assigning rights to Plaintiffs' automotive insurance coverages that Defendant WakeMed would not otherwise be entitled to.

156.    Notwithstanding, Defendant WakeMed directed Plaintiffs to sign the "general consent" form without informing, indicating, or otherwise making Plaintiffs aware of the contractual provisions relating to Plaintiffs' optional automotive insurance coverages.

157.    Defendant WakeMed directed Plaintiffs Elrod and Bertolo to sign an electronic pad that affixed their signature to the "general consent" form before Plaintiffs Elrod and Bertolo were ever given a physical copy of the document or offered adequate time to read the document.

158.    Defendant WakeMed directed Plaintiff Janine Palmer to sign the "general consent" form without making her aware of the contractual provisions concerning her optional

automotive insurance and knowing full-well she did not fully read or digest the "general consent" form because she was worried about her son's critical treatment in the adjacent trauma unit.

159.    Defendant WakeMed's actions in procuring Plaintiffs' signatures on the "general consent" form deceived Plaintiffs and coerced them into signing unnecessary contractual provisions in order to effectuate emergency medical treatment.

160.    Defendant WakeMed's actions in procuring Plaintiffs' signatures were done in or affecting commerce.

161.    Defendant WakeMed's acts and omissions in procuring Plaintiffs' signatures on documents containing contractual provisions that are wholly unnecessary for the rendering of emergency medical services, does not constitute the rendering of professional services.

162.    Defendant WakeMed's procurement of Plaintiffs' signatures on the "general consent" forms at issue in this case are the actual and foreseeable cause of Plaintiffs' injuries.

163.    As an actual and proximate cause of the Defendants' actions described above, the Plaintiffs to this action have been damaged in excess of $25,000 and are also entitled to both punitive damages and/or treble damages as allowed by law.

<u>PRAYERS FOR RELIEF</u>

WHEREFORE, Plaintiffs prays this Honorable Court:

     a.  Certify the proposed class as a class action in this case;

     b.  Allow Plaintiffs to rescind or for the Court to set aside or strike the contractual provisions complained of within the general consent form at issue and attached as *Exhibit 2* (Paragraphs numbered 6-9);

c.    Impose a constructive trust upon Defendants WakeMed and Argos to be funded with the monies and insurance proceeds improperly collected from the Plaintiffs and proposed class members, such amounts to be returned to Plaintiffs and the proposed class members, with interest;

d.    Rule in favor of Plaintiffs for all substantive claims alleged;

e.    Grant Plaintiffs compensatory and punitive damages;

f.    Grant Plaintiffs treble damages as allowed by law;

g.    Grant Plaintiffs reasonable attorney's fees as allowed by law;

h.    Rules for a jury trial on all issues so triable;

i.    Grant Plaintiffs such other further relief as this Honorable Court deems just and proper.

Respectfully submitted this 17th day of November, 2020.


The Law Offices of Colon & Associates


By:    /s/ Arlene L. Velasquez-Colon
       N.C. State Bar No.  28394
       avc@colonlaw1.com
By:    /s/ Kendra R. Alleyne
       N.C. State Bar No. 52001
       kendra@colonlaw1.com
       Attorneys for Plaintiffs
       833 B Wake Forest Business Park
       Wake Forest, North Carolina 27587
       Telephone: (919) 556-7446
       Facsimile:  (919) 556-3887

36

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this date I served the foregoing Amended

Complaint upon the Defendants' counsel or Defendants via first class mail and/or e-mail

to the following address:

>Fox Rothschild, LLP
>Matthew Nis Leerberg
>N.C. State Bar No. 35406
>mleerberg@Foxrothschild.com
>Troy D. Shelton
>N.C. State Bar No. 48070
>tshelton@Foxrothschild.com
>Post Office Box 27525
>Raleigh, NC 27611
>Telephone: (919) 755-8700
>Facsimile: (919) 755-8800
>*Counsel for Wake Med, WakeMed Physicians, LLC, WakeMed Specialists Group, LLC*
>
>Cranfill, Sumner & Hartzog, LLP
>James C. Thornton
>N.C. State Bar No. 16859
>jthorton@cshlaw.com
>Rabee R. El-Jaouhari
>N.C. State Bar No. 49184
>rjaouhari@cshlaw.com;
>Post Office Box 27808
>Raleigh, NC 27611
>Telephone: (919) 828-5100
>Facsimile: (919) 828-2277
>*Counsel for Argos Health, Inc.*
>
>McAngus Goudelock & Courie LLC
>Elizabeth H. Overmann
>N.C. State Bar No. 31736
>elizabeth.overmann@mgclaw.com
>Stephen Pytlik
>State Bar No. 50190
>stephen.pytlik@mgclaw.com;
>P.O. Box 30516
>Raleigh, NC 27622
>Telephone: (919) 719-8251
>*Counsel for Allstate Property and Casualty Insurance Company*

Coates, Kyre & Bowers, PLLC
Richard L. Pinto
N.C. State Bar No. 9412
rpinto@pckb-law.com
3202 Brassfield Road
Greensboro, NC 27410
Telephone: (336) 282-8848
Facsimile: (336) 282-8409
*Counsel for Pennsylvania National Mutual Insurance Company*

This the 17th day of November, 2020.

The Law Office of Colon and Associates, PLLC

By:     /s/ Arlene L. Velasquez-Colon
        Arlene L. Velasquez-Colon, Bar No. 28394
        Kendra R. Alleyne, Bar No. 52001
        Attorneys for Plaintiffs
        833 Durham Road, Suite B
        Wake Forest, North Carolina  27587
        Telephone:  (919) 556-7446
        Facsimile:  (919) 556-3887

## Consent For Diagnosis and Treatment

I, having a condition requiring health care, hereby consent to the provision of such care, which may include routine diagnostic procedures and such treatment as the attending physician(s) or others of WakeMed's medical staff consider necessary. I understand that WakeMed is a teaching institution, and I agree that students training to be physicians, nurses, or other health professionals may assist in providing my care. I understand that some physicians and other practitioners on the WakeMed Medical Staffs are independent practitioners/independent contractors/physicians in private practice not employed by WakeMed, and that WakeMed is not liable for their acts or omissions.

## Patient's Certification, Assignment of Insurance Benefits and Guaranty of Payment

I certify that the information given by me in applying for payment under Titles XVIII and XIX of the Social Security Act for any government benefits or for any insurance benefits is correct. I hereby authorize payment of hospital insurance, government or other third party payor benefits, including major medical, directly to WakeMed. I also authorize payment of surgical and/or medical benefits, including major medical, directly to all treating, consulting, and supervisory physicians whether direct or indirect (including WakeMed Physician Practices) and entities, including but not limited to the following independent contractors: Raleigh Pathology Lab Assoc. for the professional components of clinical and anatomic pathology, American Anesthesiology of North Carolina, Wake Radiology Consultants, PA, Wake Emergency Physicians, PA, and other contracted professionals.

I understand that I am financially responsible for, agree to pay and guarantee payment in full of any and all charges for services provided to me by WakeMed, independent physicians and other independent health care professionals involved in providing treatment or consultation to me at WakeMed, even if such treatment is not covered by insurance. I understand that my bill will be sent to the address on file unless I complete a request for my bill to be sent to an alternate address.

I authorize WakeMed and any independent practitioner(s) that have provided services to me to act as attorney-in-fact (act with authority from me) for the limited purposes of: (1) collecting benefits from any responsible third party through whatever means necessary; and (2) endorsing benefit checks made payable to me and/or WakeMed or independent practitioner(s). I acknowledge that in carrying out these functions, WakeMed is acting for its own benefit to obtain payment and is not required to act for my benefit rather than its own. If collection efforts are needed to obtain payment from me for the services and supplies provided, I agree to pay the costs of such collection efforts, including reasonable attorneys' fees.

I authorize payment of any refund that is due of any overpaid insurance benefits to be paid to the appropriate payor in accordance with my insurance policy conditions or any applicable benefit provisions where my coverages are subject to a coordination of benefits clause. If any refund is now or in the future due to me, I authorize the immediate application of any such refund to any amount that I am personally legally obligated to pay for care and services provided by WakeMed. I understand that any remaining credit due after payment of these outstanding amounts will be refunded to me.

## Release of Liability For Valuables

WakeMed cannot assume liability for money or valuables taken to the patient's room/treatment area. Money and valuables may be deposited in the hospital safe during your stay.

## Use and Release of Medical Information

I acknowledge that WakeMed, licensed physicians and other health care professionals involved in providing my care at WakeMed are authorized to use and release my medical information obtained during this visit/registration for purposes of treatment, payment and health care operations as stated in WakeMed's Notice of Privacy Practices..

**WakeMed**
General Consent
Rev. 4/15

EXHIBIT

1

I understand that this consent will automatically expire in two years. I also understand that I may revoke or discontinue my consent at any time by notifying WakeMed in writing, except to the extent actions have already been taken based upon my consent. I understand and agree to the above releases, authorizations and assignments of benefits:

Signature (Seal): ██████████████ 11/10/2016 ██████████
*(Patient or legal guardian/closest available relative/authorized representative, if patient unable to sign)*

Guardian or Representative, if any: ▢
*(Please print name)*

Signature (Seal): ▢
*(Insured/Guarantor, if different from Guardian/Relative/authorized representative)*

Name of Insured/Guarantor or Representative, if any: (printed) ██████████████

## Acknowledgement of Receipt of the WakeMed Notice of Privacy Practices

If I am a first-time patient, I certify that I have received a copy of the WakeMed Notice of Privacy Practices. If I am a returning patient, I certify that I have been offered a copy of the WakeMed Notice of Privacy Practices.

██████████████ 11/10/2016 ██████████

▢ *(X - if signature obtained after initial registration)*

| Staff Use Only: Consent to Diagnosis and Treatment Obtained By Telephone | Staff Use Only: |
|---|---|
| Treatment / procedure: _____ | ▢ Patient unable to sign due to condition and /or level of consciousness |
| _____ | ▢ Patient refused to sign after receiving Privacy Notice |
| Authorized Person Giving Consent _____ Telephone #: _____ | ▢ For ED use only (Privacy Notice given to minor/caretaker in absence of parent) |
| Relationship to Patient: _____ | ▢ For ED use only (unable to sign due to emergency transfer to another hospital) |
| Witness: _____ Witness: _____ | ▢ Other _____ |
| Date: _____ Time: _____ | Completed by: _____ Date: _____ |

██████████

**WakeMed**
**General Consent**
**Rev. 4/15**

**1** **Consent for Diagnosis and Treatment:**  I hereby consent to the provision of all medical treatment and other health care that my physician(s) or other caregivers consider necessary, which may include diagnostic, radiology, and laboratory procedures provided to me at any WakeMed location. I understand that this consent is valid for up to two years. If I am or may be pregnant, I agree to tell my practitioner and hereby consent to radiology imaging (e.g. x-ray, CT, etc.) and other treatment, as agreed with my practitioner.

**2** **Independent Practitioners and Students:**  I understand and agree that many physicians and other individuals involved in my care at WakeMed are <u>independent contractors</u> in private practice, are <u>not employed by WakeMed</u>, and that <u>WakeMed is not liable</u> for their acts or failures to act. This includes, but is not limited to: <u>emergency room, anesthesia, radiology, and laboratory physicians and other practitioners; students, interns, residents, and fellows; constant observers; and many other physicians, health care providers, and non-clinical staff</u>. I understand that I may receive separate bill(s) from one or more independent providers or groups who were involved with my care. I also recognize that WakeMed is a teaching institution, and I agree that students training to be physicians, nurses, or other health care professionals may assist in providing my care.

**3** **Use and Release of Medical Information:**  I acknowledge that WakeMed, its staff, and other independent physicians and health care professionals involved in providing my care at WakeMed are authorized to use and release my medical information for purposes of treatment, payment and health care operations as stated in WakeMed's Notice of Privacy Practices.

**4** **Patient's Certification:**  I certify that the information provided in applying for payment under Medicare, Medicaid, or any other government programs or insurance benefits is complete and accurate in all respects and agree that I am financially responsible to WakeMed if it is not.

**5** **Guaranty of Payment:**  I understand that I will be financially responsible for and hereby agree to pay and to guarantee payment in full of any and all charges for services provided by WakeMed, independent groups, physicians, or other health care professionals involved in providing treatment or consultation to me, even if such treatment is not covered by insurance. In the event of nonpayment, I agree to pay, and do hereby guarantee the payment of, all costs of collection, including reasonable attorneys' fees. I understand that my bill(s) will be sent to the address on file unless I submit a complete written request for my bill(s) to be sent to an alternate address.

**6** **Irrevocable Assignment of Insurance Benefits:**  I, on behalf of myself and the patient, in consideration of health care services provided, voluntarily and irrevocably assign and authorize direct payment of all surgical and medical benefits directly to WakeMed and WakeMed Physician Practices (WPP). I also authorize payment of applicable benefits directly to all physicians or other practitioners involved in my care, including but not limited to independent physicians and groups practicing at WakeMed (e.g. emergency medicine, radiology, anesthesia, laboratory/pathology, and certain surgeons, physicians, and other practitioners and groups). Benefits assigned shall include, but may not be limited to, major medical insurance, liability insurance (including excess, umbrella and automobile uninsured/underinsured coverages), medpay and personal injury protection (PIP) benefits.

**7** I understand this assignment means that WakeMed can and will seek and receive direct payment from any potential insurer or other payment source, which may limit what I can recover personally for my injury. I further understand that until my charges are properly paid by some insurer, I and the patient remain personally responsible for all charges. I authorize WakeMed, as necessary, to endorse benefit checks made payable to me and/or WakeMed or independent practitioner(s). I understand and agree that in carrying out these functions, WakeMed is acting for its own benefit to obtain payment and is not required to act for my benefit. I further understand that should any of my charges not be covered by any insurer for any reason, including a determination that they were not medically necessary, I and the patient remain personally responsible for full payment. If my health insurer is not the entity making payment, I agree that any contractual discount may not apply.

**8** **Overpayments and Refunds:**  I authorize return or payment of any overpayment received within WakeMed's sole discretion. If any refund becomes due to me or to the patient, I authorize WakeMed to apply any such amount(s) to any charges that remain outstanding for services provided to me or the patient (or for which either of us is legally responsible) at any time as allowed by law.

**9** **Assertion of Lien:**  I, for myself and the patient, voluntarily and irrevocably agree that, if any claim or lawsuit is made against any liability, medpay, uninsured, or underinsured motorist insurance coverage(s) related to injuries/loss for which I received care at any WakeMed or WPP location, WakeMed may seek and perfect a lien against said claim and/or recovery to the fullest extent allowed by law and may seek payment of its full and undiscounted charges from any and all proceeds to be paid from any of the insurance coverage set out above. I, for myself and the patient, further agree to provide WakeMed with the name, address, policy number and claim number for every insurance carrier that may provide liability, medpay, uninsured and underinsured insurance coverages. I understand that if I fail to do so, I may be responsible personally for WakeMed undiscounted charges and the charges of other professionals who provide care and treatment.

---

**WakeMed**
**General Consent**

PAGE 1 OF 2      REV. 8/17

EXHIBIT
2

**10** **Release of Liability For Valuables:** I understand and agree that WakeMed cannot assume liability for money or valuables (e.g. cell phones, jewelry, purses, glasses, cash, medications, or other personal property) brought to its facilities, including into a patient room or treatment area. Money and valuables should be sent home with a family member or close friend. If anyone chooses to keep money or valuables with him/her, these items are that person's responsibility and I agree that <u>WakeMed is not liable if they are lost, damaged, or stolen</u>. Clinical and nursing staff cannot accept valuables for safekeeping.

**11** **Termination of this Consent:** I understand that I may withdraw my consent as to future actions at any time by notifying WakeMed in writing, but such notice will not affect actions already taken based upon my prior consent or which are noted above to be irrevocable (meaning consent cannot be withdrawn). I understand and agree that such action may result in the patient and me being responsible for payment of all charges, which may not be subject to any reduction, adjustment, or discount.

**12** **"White Board" Consent:** Certain areas of WakeMed (including the Rehab Hospital) use a small, dry-erase board called the "White Board." The "White Board" is a tool used by members of your treatment team to communicate information about your current functional status and other care-related issues. The "White Board" is updated frequently to help assure accurate communication between care providers. Specific information may include your level of independence or assistance needed for eating, talking, walking, transfers, using the bathroom, bathing, and other tasks. Visitors to your room may see this information, but we are requesting your consent to use this team communication to help ensure you receive the care and support you need. If you have concerns about use of the "White Board," please talk with your care team.

**13** **WakeMed Rehab Hospital Medicare Assessment and/or Program Evaluation Information** *(applicable to patients in the Rehab Hospital)*: The federal government requires rehabilitation hospitals to submit demographic, financial, and clinical information to Medicare to verify that the rehab services provided are reasonable and necessary. The information submitted will be entered into a Patient Assessment Instrument, which you may request to review. Additionally, WakeMed submits information to an external evaluation agency to monitor the effectiveness of our rehabilitation programs. The information collected is considered confidential and will be disclosed only for legitimate purposes allowed by law. You may be contacted by this external agency to gather information about our rehabilitation program and your experience, but you are not required to answer any question(s).

**I understand and agree to the above statements, releases, authorizations, and assignments of benefits. If I am signing this for a patient other than myself, any reference to "I" or "me" includes me and the patient.**

Signature (Seal): _____Date: _____ Time: _____ Guardian or Representative, if any: _____
*(Patient or legal guardian/closest available relative/authorized representative, if patient unable to sign)* (Please print name)

Signature (Seal): _____ Date: _____ Time: _____
*(Insured/Guarantor, if different from Guardian/Relative/authorized representative)*

Name of Insured/Guarantor or Representative, if any: (printed) _____

**Acknowledgement of Receipt of the WakeMed Notice of Privacy Practices**
If I am a first-time patient, I certify that I have received a copy of the WakeMed Notice of Privacy Practices. If I am a returning patient, I certify that I have been offered a copy of the WakeMed Notice of Privacy Practices.

Signature: _____ Date: _____ Time: _____ ☐ Signature obtained after initial registration

| Staff Use Only:  Consent to Diagnosis and Treatment Obtained By Telephone | Staff Use Only: |
|---|---|
| Treatment / procedure: _____ | ☐ Patient unable to sign due to condition and/or level of consciousness |
| _____ | ☐ Patient refused to sign after receiving Privacy Notice |
| Authorized Person Giving Consent: _____ Telephone #: _____ | ☐ For ED only (Privacy Notice given to minor/caretaker in absence of parent) |
| Relationship to Patient: _____ | ☐ For ED only (unable to sign due to emergency transfer to another hospital) |
| Witness: _____ Witness: _____ | ☐ Other _____ |
| Date: _____ Time: _____ Date: _____ Time: _____ | Completed by: _____ Date: _____ Time: _____ |

Case 5:20-cv-00413-FL   Document 64   Filed 11/17/20   Page 42 of 79
Defs.' Exhibits F



Plaintiffs' Exhibits 063

EXHIBIT

3

**AOB Claim** 

**Consent for Diagnosis and Treatment:** I hereby consent to the provision of all medical treatment and other health care that my physician(s) or other caregivers consider necessary, which may include diagnostic, radiology, and laboratory procedures provided to me at any WakeMed location. I understand that this consent is valid for up to two years. If I am or may be pregnant, I agree to tell my practitioner and hereby consent to radiology imaging (e.g. x-ray, CT, etc.) and other treatment, as agreed with my practitioner.

**Independent Practitioners and Students:** I understand and agree that many physicians and other individuals involved in my care at WakeMed are independent contractors in private practice, are not employed by WakeMed, and that WakeMed is not liable for their acts or failures to act. This includes, but is not limited to: emergency room, anesthesia, radiology, and laboratory physicians and other practitioners; students, interns, residents, and fellows; constant observers; and many other physicians, health care providers, and non-clinical staff. I understand that I may receive separate bill(s) from one or more independent providers or groups who were involved with my care. I also recognize that WakeMed is a teaching institution, and I agree that students training to be physicians, nurses, or other health care professionals may assist in providing my care.

**Use and Release of Medical Information:** I acknowledge that WakeMed, its staff, and other independent physicians and health care professionals involved in providing my care at WakeMed are authorized to use and release my medical information for purposes of treatment, payment and health care operations as stated in WakeMed's Notice of Privacy Practices.

**Patient's Certification:** I certify that the information provided in applying for payment under Medicare, Medicaid, or any other government programs or insurance benefits is complete and accurate in all respects and agree that I am financially responsible to WakeMed if it is not.

**Guaranty of Payment:** I understand that I will be financially responsible for and hereby agree to pay and to guarantee payment in full of any and all charges for services provided by WakeMed, independent groups, physicians, or other health care professionals involved in providing treatment or consultation to me, even if such treatment is not covered by insurance. In the event of nonpayment, I agree to pay, and do hereby guarantee the payment of, all costs of collection, including reasonable attorneys' fees. I understand that my bill(s) will be sent to the address on file unless I submit a complete written request for my bill(s) to be sent to an alternate address.

**Irrevocable Assignment of Insurance Benefits:** I, on behalf of myself and the patient, in consideration of health care services provided, voluntarily and irrevocably assign and authorize direct payment of all surgical and medical benefits directly to WakeMed and WakeMed Physician Practices (WPP). I also authorize payment of applicable benefits directly to all physicians or other practitioners involved in my care, including but not limited to independent physicians and groups practicing at WakeMed (e.g. emergency medicine, radiology, anesthesia, laboratory/pathology, and certain surgeons, physicians, and other practitioners and groups). Benefits assigned shall include, but may not be limited to, major medical insurance, liability insurance (including excess, umbrella and automobile uninsured/underinsured coverages), medpay and personal injury protection (PIP) benefits.
I understand this assignment means that WakeMed can and will seek and receive direct payment from any potential insurer or other payment source, which may limit what I can recover personally for my injury. I further understand that until my charges are properly paid by some insurer, I and the patient remain personally responsible for all charges. I authorize WakeMed, as necessary, to endorse benefit checks made payable to me and/or WakeMed or independent practitioner(s). I understand and agree that in carrying out these functions, WakeMed is acting for its own benefit to obtain payment and is not required to act for my benefit. I further understand that should any of my charges not be covered by any insurer for any reason, including a determination that they were not medically necessary, I and the patient remain personally responsible for full payment. If my health insurer is not the entity making payment, I agree that any contractual discount may not apply.

**Overpayments and Refunds:** I authorize return or payment of any overpayment received within WakeMed's sole discretion. If any refund becomes due to me or to the patient, I authorize WakeMed to apply any such amount(s) to any charges that remain outstanding for services provided to me or the patient (or for which either of us is legally responsible) at any time as allowed by law.

**Assertion of Lien:** I, for myself and the patient, voluntarily and irrevocably agree that, if any claim or lawsuit is made against any liability, medpay, uninsured, or underinsured motorist insurance coverage(s) related to injuries/loss for which I received care at any WakeMed or WPP location, WakeMed may seek and perfect a lien against said claim and/or recovery to the fullest extent allowed by law and may seek payment of its full and undiscounted charges from any and all proceeds to be paid from any of the insurance coverage set out above. I, for myself and the patient, further agree to provide WakeMed with the name, address, policy number and claim number for every insurance carrier that may provide liability, medpay, uninsured and underinsured insurance coverages. I understand that if I fail to do so, I may be responsible personally for WakeMed undiscounted charges and the charges of other professionals who provide care and treatment.

**Release of Liability For Valuables:** I understand and agree that WakeMed cannot assume liability for money or valuables (e.g. cell phones, jewelry, purses, glasses, cash, medications, or other personal property) brought to its facilities, including into a patient room or treatment area. Money and valuables should be sent home with a family member or close friend. If anyone chooses to keep money or valuables with him/her, these items are that person's responsibility and I agree that WakeMed is not liable if they are lost, damaged, or stolen. Clinical and nursing staff cannot accept valuables for safekeeping.

**Termination of this Consent:** I understand that I may withdraw my consent as to future actions at any time by notifying WakeMed in writing, but such notice will not affect actions already taken based upon my prior consent or which are noted above to be irrevocable (meaning consent cannot be withdrawn). I understand and agree that such action may result in the patient and me being responsible for payment of all charges, which may not be subject to any reduction, adjustment, or discount.



Yvonne J Bertolo
MR#:
CSN#:

**WakeMed**
**General Consent**
Page 1 of 2    Rev. 8/17

MM
Received Date 11042019

EXHIBIT
4

tool used by members of your treatment team to communicate information about your current functional status and other care-related issues. The "White Board" s updated frequently to help assure accurate communication between care providers. Specific information may include your level of independence or assistance needed for eating, talking, walking, transfers, using the bathroom, bathing, and other tasks. Visitors to your room may see this information, but we are equesting your consent to use this team communication to help ensure you receive the care and support you need. If you have concerns about use of the White Board," please talk with your care team.

**WakeMed Rehab Hospital Medicare Assessment and/or Program Evaluation Information** *(applicable to patients in the Rehab Hospital)*: The federal government requires rehabilitation hospitals to submit demographic, financial, and clinical information to Medicare to verify that the rehab services provided are reasonable and necessary. The information submitted will be entered into a Patient Assessment Instrument, which you may request to review. Additionally, WakeMed submits information to an external evaluation agency to monitor the effectiveness of our rehabilitation programs. The information collected is considered confidential and will be disclosed only for legitimate purposes allowed by law. You may be contacted by this external agency to gather information about your rehabilitation program and your experience, but you are not required to answer any question(s).

**I understand and agree to the above statements, releases, authorizations, and assignments of benefits. If I am signing this for a patient other than myself, any reference to "I" or "me" includes me and the patient.**

Signature (Seal):

Patient's Signature for General Consent

Signature captured with Topaz by Bertolo, Yvonne J at 10/15/2019 9:44:05 PM

*(Patient or legal guardian/closest available relative/authorized representative, if patient unable to sign)*

Guardian or Representative, if any:

Print Legal Guardian Name or Representative

Yvonne Bertolo

Tue Oct 2019 10/15/1 Signature captured with Topaz

*(Please print name)*

Signature (Seal):

*Insured/Guarantor,*
*if different from Guardian/Relative/authorized representative)*

Name of Insured/Guarantor or Representative, if any:

(printed)

**Acknowledgement of Receipt of the WakeMed Notice of Privacy Practices**

If I am a first-time patient, I certify that I have received a copy of the WakeMed Notice of Privacy Practices. If I am a returning patient, I certify that I have been offered a copy of the WakeMed Notice of Privacy Practices.

Notice of Pt Privacy,Fin.Policy, and Rights & Resp

Signature captured with Topaz by Bertolo, Yvonne J at 10/15/2019 9:44:06 PM

*(X - isignature obtained after initial registration)*

| Staff Use Only: Consent to Diagnosis and Treatment Obtained By Telephone | | | Staff Use Only: |
|---|---|---|---|
| Treatment / procedure: | | | ☐ Patient unable to sign due to condition and/or level of consciousness |
| | | | ☐ Patient refused to sign after receiving Privacy Notice |
| Authorized Person Giving Consent: | | Telephone #: | ☐ For ED use only (Privacy Notice given to minor/caretaker in absence of parent) |
| Relationship to Patient: | | | ☐ For ED use only (unable to sign due to emergency transfer to another hospital) |
| Witness: | | Witness: | ☐ Other |
| Date: | Time: | Date: | Time: | Completed by: | Date: | Time: |

**Yvonne J Bertolo**
MR#:
CSN#:

**WakeMed**
**General Consent**
**Page 2 of 2   Rev 8/17**

MM

Received Date 11042019



**WAKEMED NORTH HOSPITAL** Elrod, Peggy
10000 Falls of the Neuse    MRN: ███████  DOB: ███████, Sex: F
Raleigh NC 27614-7839    Adm: 4/5/2019, D/C: 4/5/2019

**04/05/2019 - ED In WakeMed North Emergency Services (continued)**

**Documents**

**e-General Consent/HIPAA - Electronic signature on 4/5/2019  4:51 PM (effective from 4/5/2019) - Signed**

**Consent for Diagnosis and Treatment:** I hereby consent to the provision of all medical treatment and other health care that my physician(s) or other caregivers consider necessary, which may include diagnostic, radiology, and laboratory procedures provided to me at any WakeMed location. I understand that this consent is valid for up to two years. If I can or may be pregnant, I agree to tell my practitioner and hereby consent to radiology imaging (e.g. x-ray, CT, etc.) and other treatment, as agreed with my practitioner.

**Independent Practitioners and Students:** I understand and agree that many physicians and other individuals involved in my care at WakeMed are independent contractors in private practice, are not employed by WakeMed, and that WakeMed is not liable for their acts or failures to act. This includes, but is not limited to, emergency room anesthetists, radiologists, and behavioral physicians and other practitioners, students, interns, residents, and fellows, contract observers, and many other physicians, health care providers and non-clinical staff. I understand that I may receive separate bill(s) from one or more independent providers or groups who were involved with my care. I also recognize that WakeMed is a teaching institution, and I understand that students training to be physicians, nurses, or other health care professionals may assist in providing my care.

**Use and Release of Medical Information:** I acknowledge that WakeMed, its staff, and other independent physicians and health care professionals involved in providing my care at WakeMed are authorized to use and release my medical information for purposes of treatment, payment, and health care operations as stated in WakeMed's Notice of Privacy Practices.

**Patient's Certification:** I certify that the information provided in applying for payment under Medicare, Medicaid, or any other government programs or insurance benefits is complete and accurate in all respects and agree that I am financially responsible to WakeMed if it is not.

**Guaranty of Payment:** I understand that I will be financially responsible for and hereby agree to pay and to guarantee payment in full of any and all charges for services provided by WakeMed, independent groups, physicians, or other health care professionals involved in providing treatment to me, even if such treatment is not covered by insurance. In the event of nonpayment, I agree to pay, and to hereby guarantee the payment of, all costs of collection, including reasonable attorneys' fees. I understand that my bill(s) will be sent to the address on file unless I submit a complete written request for my bill(s) to be sent to an alternate address.

**Irrevocable Assignment of Insurance Benefits:** I, on behalf of myself and the patient, in consideration of health care services provided, voluntarily and irrevocably assign and authorize direct payment of all surgical and medical benefits directly to WakeMed and WakeMed Physicians Practices (WPP). I also authorize payment of applicable benefits directly to all physicians or other practitioners involved in my care, including but not limited to independent physicians and groups practicing at WakeMed (e.g. emergency medicine, radiology, anesthesia, laboratory/pathology, and certain surgeons, physicians, and other practitioners and groups). Benefits assigned shall include, but may not be limited to, major medical insurance, liability insurance (including auto), umbrella and automobile uninsured/underinsured coverages), medpay and personal injury protection (PIP) benefits.

I understand this assignment means that WakeMed can and will seek and receive direct payment from any potential source or other payment source which may limit what I can recover personally for my equity. I further understand that until any charges are properly paid by some source, I and the patient remain personally responsible for all charges. I authorize WakeMed, as necessary, to endorse benefit checks made payable to me and/or WakeMed or independent practitioner(s). I understand and agree that in carrying out these functions, WakeMed or acting for its own benefit to obtain payment and is not required to act for my benefit. I further understand that should any of my charges not be covered by any insurer for any reason, including a determination that these were not medically necessary, I and the patient remain personally responsible for full payment. If my health insurer is not the entity making payment, I agree that any contractual discount may not apply.

**Overpayments and Refunds:** I authorize return or payment of any overpayment received within WakeMed's sole discretion. If any refund becomes due to me or to the patient, I authorize WakeMed to apply any such amount(s) to any charges that remain outstanding for services provided to me or the patient for which either of us is legally responsible at any time as allowed by law.

**Assertion of Lien:** I, for myself and the patient, voluntarily and irrevocably agree that, if any claim or recovery is made against any liability, medpay, uninsured/underinsured motorist insurance coverage(s) related to injuries/care for which I received care at any WakeMed or WPP location, WakeMed may seek and perfect a lien against said claim and/or recovery to the fullest extent allowed by law and may seek payment of its full and undiscounted charges from any and all proceeds to be paid from any of the insurance coverages set out above. I, for myself and the patient, further agree to provide WakeMed with the name, address, policy number and claim number for every insurance carrier that may provide liability, medpay, uninsured and underinsured insurance coverage. I understand that if I fail to do so, I may be responsible personally for WakeMed discounted charges and the charges of other professionals who provide care and treatment.

**Release of Liability For Valuables:** I understand and agree that WakeMed cannot assume liability for money or valuables (e.g. cell phones, jewelry, purses, glasses, cash, medications, or other personal property) brought in its facilities including into a patient room or treatment area. Money and valuables should be sent home with a family member or close friend. If anyone chooses to keep money or valuables with him/her, these items are that person's responsibility and I agree that WakeMed is not liable if these are lost, damaged, or stolen. Clinical and nursing staff cannot accept valuables for safekeeping.

**Termination of this Consent:** I understand that I may withdraw my consent as to future actions at any time by notifying WakeMed in writing, but such notice will not affect actions already taken based upon my prior consent or which are noted above to be irrevocable (meaning consent cannot be withdrawn). I understand and agree that such action may result in the patient and me being responsible for payment of all charges, which may not be subject to any reduction, adjustment, or discount.

Peggy Elrod
MRN: ███████
CSN: ███████

WakeMed
General Consent
Page 1 of 2   Rev. 8/17



**"White Board" Consent:** Certain areas of WakeMed (including the Rehab Hospital) use a small, dry-erase board called the "White Board." The "White Board" is a tool used by members of your treatment team to communicate information about your current functional status and other care-related issues. The "White Board" is updated frequently to help assure accurate communication between care providers. Specific information may include your level of independence or assistance needed for eating, talking, walking, transfers, using the bathroom, bathing, and other tasks. Visitors to your room may see this information, but we are



WAKEMED NORTH HOSPITAL Elrod, Peggy
10000 Falls of the Neuse          MRN: ████    DOB: ████  Sex: F
Raleigh NC 27614-7839             Adm: 4/5/2019, D/C: 4/5/2019

**04/05/2019 - ED in WakeMed North Emergency Services (continued)**

**Documents (continued)**

requesting your consent to use this team communication to help ensure you receive the care and support you need. If you have concerns about use of the "White Board," please talk with your care team

**WakeMed Rehab Hospital Medicare Assessment and/or Program Evaluation Information** *(applicable to patients in the Rehab Hospital):* The federal government requires rehabilitation hospitals to submit demographic, financial, and clinical information to Medicare to verify that the rehab services provided are reasonable and necessary. The information submitted will be entered into a Patient Assessment Instrument, which you may request to review. Additionally, WakeMed submits information to an external evaluation agency to monitor the effectiveness of our rehabilitation programs. The information collected is considered confidential and will be disclosed only for legitimate purposes allowed by law. You may be contacted by this external agency to gather information about your rehabilitation program and your experience, but you are not required to answer any questions.

I understand and agree to the above statements, releases, authorizations, and assignments of benefits. If I am signing this for a patient other than myself, any reference to "I" or "me" includes me and the patient.

Signature (Seal).                                         Guardian or Representative. If any:

*Patient's Signature for General Account*

*Peggy R. Elrod*

Fri ___ 2019 04/05/19 ___ ___

*(Patient or legal guardian/closest available
relative/authorized representative, if patient unable to sign)*

                                                        *(Please print name)*

Signature (Seal).                                        Name of Insured/Guarantor or Representative if any:

*Print Name of Insured/Guarantor*

*Peggy Elrod*

Fri Apr 2019 04/05/19 ___ ___

*(Insured/Guarantor.                                      (printed)
if different from Guardian/Relative/authorized representative)*

**Acknowledgement of Receipt of the WakeMed Notice of Privacy Practices**

If I am a first-time patient I certify that I have received a copy of the WakeMed Notice of Privacy Practices. If I am a returning patient, I certify that I have been offered a copy of the WakeMed Notice of Privacy Practices.

*Signature acknowledging Privacy Practices*

*Peggy R. Elrod*

Fri ___ 2019 04/05/19 ___ ___

                                                        (X - signature obtained after initial registration)

**Staff Use Only: Consent to Diagnosis and Treatment Obtained by Telephone**

Treatment Consent to: _____    Staff Use Only:
                                                 ☐ Patient unable to sign due to condition and/or urgency of circumstances
                                                 ☐ Patient declined to sign after receiving Privacy Notice
Authorized Person Giving Consent: _____ Telephone #. ☐ Patient in ED and only Privacy Notice given to representative (access at exempt)
Relationship to Patient: _____    ☐ Bed-ED and unable to sign due to emergency transfer to another hospital
Witness: _____ Witness: _____    ☐ Other: _____
Date: _____ Time: _____ Date: _____ Time: ___    Completed by: _____ Date: ____ Time: ___

Peggy Elrod                      **WakeMed**                 
MR#: ████                      General Consent
CSN#: ████                    Page 2 of 2   Rev 8/17



EXHIBIT
6







Plaintiffs' Exhibits 003

 WAKEMED RALEIGH CAMPUS HOSPITAL — Palmer, Justin M
3000 New Bern Avenue
Raleigh NC 27610-1231

MRN: ▮▮▮▮▮ DOB: ▮▮▮▮▮ Sex: M
Adm: 4/26/2019, D/C: 4/26/2019

**04/26/2019 - ED In WakeMed Raleigh Campus Emergency Department (continued)**

**Documents (continued)**

**Consent for Diagnosis and Treatment:** I hereby consent to the provision of all medical treatment and other health care that my physician(s) or other caregivers consider necessary, which may include diagnostic, radiology, and laboratory procedures provided to me at any WakeMed location. I understand that this consent is valid for up to two years. If I am or may be pregnant, I agree to tell my practitioner and hereby consent to radiology imaging (e.g. x-ray, CT, etc.) and other treatment, as agreed with my practitioner.

**Independent Practitioners and Students:** I understand and agree that many physicians and other individuals involved in my care at WakeMed are independent contractors in private practice, are not employed by WakeMed, and that WakeMed is not liable for their acts or failures to act. This includes, but is not limited to, emergency room, anesthesia, radiology, and laboratory physicians and other practitioners; students, interns, residents, and fellows, constant observers; and many other physicians, health care providers, and non-clinical staff. I understand that I may receive separate bill(s) from one or more independent providers or groups who were involved with my care. I also recognize that WakeMed is a teaching institution, and I agree that students training to be physicians, nurses, or other health care professionals may assist in providing my care.

**Use and Release of Medical Information:** I acknowledge that WakeMed, its staff, and other independent physicians and health care professionals involved in providing my care at WakeMed are authorized to use and release my medical information for purposes of treatment, payment and health care operations as stated in WakeMed's Notice of Privacy Practices.

**Patient's Certification:** I certify that the information provided in applying for payment under Medicare, Medicaid, or any other government programs or insurance benefits is complete and accurate in all respects and agree that I am financially responsible to WakeMed if it is not.

**Guaranty of Payment:** I understand that I will be financially responsible for and hereby agree to pay and to guarantee payment in full of any and all charges for services provided by WakeMed, independent groups, physicians, or other health care professionals involved in providing treatment or consultation to me, even if such treatment is not covered by insurance. In the event of nonpayment, I agree to pay, and do hereby guarantee the payment of, all costs of collection, including reasonable attorneys' fees. I understand that my bill(s) will be sent to the address on file unless I submit a complete written request for my bill(s) to be sent to an alternate address.

**Irrevocable Assignment of Insurance Benefits:** I, on behalf of myself and the patient, in consideration of health care services provided, voluntarily and irrevocably assign and authorize direct payment of all surgical and medical benefits directly to WakeMed and WakeMed Physician Practices (WPP). I also authorize payment of applicable benefits directly to all physicians or other practitioners involved in my care, including but not limited to independent physicians and groups practicing at WakeMed (e.g. emergency medicine, radiology, anesthesia, laboratory/pathology, and certain surgeons, physicians, and other practitioners and groups). Benefits assigned shall include, but may not be limited to, major medical insurance, liability insurance (including excess, umbrella and automobile uninsured/underinsured coverages), medpay and personal injury protection (PIP) benefits.

I understand this assignment means that WakeMed can and will seek and receive direct payment from any potential insurer or other payment source, which may limit what I can recover personally for my injury. I further understand that until my charges are properly paid by some insurer, I and the patient remain personally responsible for all charges. I authorize WakeMed, as necessary, to endorse benefit checks made payable to me and/or WakeMed or independent practitioner(s). I understand and agree that in carrying out these functions, WakeMed is acting for its own benefit to obtain payment and is not required to act for my benefit. I further understand that should any of my charges not be covered by any insurer for any reason, including a determination that they were not medically necessary, I and the patient remain personally responsible for full payment. If my health insurer is not the entity making payment, I agree that any contractual discount may not apply.

**Overpayments and Refunds:** I authorize return or payment of any overpayment received within WakeMed's sole discretion. If any refund becomes due to me or to the patient, I authorize WakeMed to apply any such amounts to any charges that remain outstanding for services provided to me or the patient (or for which either of us is legally responsible) at any time as allowed by law.

**Assertion of Lien:** I, for myself and the patient, voluntarily and irrevocably agree that, if any claim or lawsuit is made against any liability, medpay, uninsured, or underinsured motorist insurance coverage(s) related to injuries/loss for which I received care at any WakeMed or WPP location, WakeMed may seek and perfect a lien against said claim and/or recovery to the fullest extent allowed by law and may seek payment of its full and undiscounted charges from any and all proceeds to be paid from any of the insurance coverage set out above. I, for myself and the patient, further agree to provide WakeMed with the name, address, policy number and claim number for every insurance carrier that may provide liability, medpay, uninsured and underinsured insurance coverages. I understand that if I fail to do so, I may be responsible personally for WakeMed undiscounted charges and the charges of other professionals who provide care and treatment.

Justin Michael Palmer
MR#: ▮▮▮▮▮
CSN#: ▮▮▮▮▮

WakeMed
General Consent
Page 1 of 2   Rev. 8/17





WAKEMED RALEIGH CAMPUS HOSPITAL
3000 New Bern Avenue
Raleigh NC 27610-1231

Palmer, Justin M
MRN: [redacted] DOB: [redacted], Sex: M
Adm: 4/26/2019, D/C: 4/26/2019

**04/26/2019 - ED in WakeMed Raleigh Campus Emergency Department (continued)**

**Documents (continued)**

**Release of Liability For Valuables:** I understand and agree that WakeMed cannot assume liability for money or valuables (e.g. cell phones, jewelry, purses, glasses, cash, medications, or other personal property) brought to its facilities, including into a patient room or treatment area. Money and valuables should be sent home with a family member or close friend. If anyone chooses to keep money or valuables with him/her, these items are that person's responsibility and I agree that WakeMed is not liable if they are lost, damaged, or stolen. Clinical and nursing staff cannot accept valuables for safekeeping.

**Termination of this Consent:** I understand that I may withdraw my consent as to future actions at any time by notifying WakeMed in writing, but such notice will not affect actions already taken based upon my prior consent or which are noted above to be irrevocable (meaning consent cannot be withdrawn). I understand and agree that such action may result in the patient and me being responsible for payment of all charges, which may not be subject to any reduction, adjustment, or discount.

**"White Board" Consent:** Certain areas of WakeMed (including the Rehab Hospital) use a small, dry-erase board called the "White Board." The "White Board" is a tool used by members of your treatment team to communicate information about your current functional status and other care-related issues. The "White Board" is updated frequently to help assure accurate communication between care providers. Specific information may include your level of independence or assistance needed for eating, talking, walking, transfers, using the bathroom, bathing, and other tasks. Visitors to your room may see this information, but we are requesting your consent to use this team communication to help ensure you receive the care and support you need. If you have concerns about use of the "White Board," please talk with your care team.

**WakeMed Rehab Hospital Medicare Assessment and/or Program Evaluation Information** *(applicable to patients in the Rehab Hospital).* The federal government requires rehabilitation hospitals to submit demographic, financial, and clinical information to Medicare to verify that the rehab services provided are reasonable and necessary. The information submitted will be entered into a Patient Assessment Instrument, which you may request to review. Additionally, WakeMed submits information to an external evaluation agency to monitor the effectiveness of our rehabilitation programs. The information collected is considered confidential and will be disclosed only for legitimate purposes allowed by law. You may be contacted by this external agency to gather information about our rehabilitation program and your experience, but you are not required to answer any question(s).

---

I understand and agree to the above statements, releases, authorizations, and assignments of benefits. If I am signing this for a patient other than myself, any reference to "I" or "me" includes me and the patient.

Mother

Signature (Self) _____ Date: _____ Time: _____ Guardian or Representative, if any: _____
*(Patient or legal guardian if best available method authorized representative, if patient unable to sign)*
(Please print name)

Signature (Self) _____ Date: _____ Time: _____
*(Insured/Guarantor, if different from Guardian/Relative/authorized representative)*

Name of Insured/Guarantor or Representative, if any: (printed) Janice Palmer

**Acknowledgement of Receipt of the WakeMed Notice of Privacy Practices**
If I am a first-time patient, I certify that I have received a copy of the WakeMed Notice of Privacy Practices. If I am a returning patient, I certify that I have been offered a copy of the WakeMed Notice of Privacy Practices.

Signature _____ Date: _____ Time: _____ (X = if signature obtained after initial registration)

Staff Use Only: Consent to Diagnostic and Treatment of Obtain by Telephone

Treatment/procedure _____

Authorized Person Giving Consent _____ Telephone # _____

Relationship to Patient _____

Witness _____ Witness _____

Date _____ Time _____ Date _____ Time _____

Staff Use Only:
☐ Patient unable to sign due to condition and/or level of consciousness
☐ Patient refused to sign after receiving Notice/notice
☐ First ED non-specific stay. Notice given to resident/resident's attorney at guardian
☐ Er or ED non-emergent care for sign due to emergency/transfer to another hospital
☐ Other

Completed by: _____ Date _____ Time _____

Justin Michael Palmer
MR#: [redacted]
CSN# [redacted]

WakeMed
General Consent
Page 2 of 2   Rev. 8/17

**Argos Health has released a new white paper - *Out-of-State Medicaid Claims: From Afterthought to Revenue Opportunity*. Download it here (https://complexclaims.com/out-of-state-medicaid-claims/#whitepaper).**



# Motor Vehicle Accident Claims

## Motor Vehicle Accident / Third Party Liability Complex Claims Revenue Recovery Service

Many providers find billing motor vehicle accident (MVA) and other third-party liability (TPL) claims to be difficult and time-consuming. Would you like to achieve any of the following?

- Easily identifying motor vehicle accident claims at time of registration

- Experienced attorneys negotiating on your behalf

- Submitting claims quickly enough to take advantage of

**Quick Links**

📹 Video

Ⓦ White Paper

📄 Sales Sheet

☰ FAQ



EXHIBIT
8

PIP/Medpay benefits before they are exhausted
- Spending less time arguing with commercial insurance companies about denied motor vehicle claims
- Liens filed timely and in accordance with state laws
- Coordinating benefits properly, as defined by contractual requirements
- Higher levels of patient satisfaction

If so, Argos Health can *definitely* help.

## Our Solution

Quite simply, we handle motor vehicle accident claims from start to finish.

Our straightforward automatic claim assignment logic identifies MVA claims in your hospital's EHR system. This is critical since improperly submitting an accident claim to a

> "After reviewing the Argos work, we have come to the conclusion there is no way our previous team of four people could ever do what your team is doing."
>
> **DIRECTOR, REVENUE CYCLE**
> Level I Trauma Center

government or commercial insurer can result in an immediate denial or a request for a takeback months later. As a result, by the time the claim is reprocessed as an MVA claim, there may be no funds available for payment.

To properly coordinate reimbursement on an accident claim, it's critical to find as much information as possible about the accident and to do so promptly. Our claim intake team ensures

motor vehicle accident claims are appropriately identified and immediately begin collecting the necessary information from insurers, government agencies, and patients.

Accident claims often involve multiple payers who may be responsible for payment of a hospital's charges. The question is: from which payer should a hospital seek payment? Argos Health handles the complex decision points affecting a hospital's ability to receive proper reimbursement on its accident claims.

In the case of an automobile accident, we'll first attempt to collect payments via PIP/Medpay sources – medical insurance associated with auto insurance policies. If no PIP/Medpay is available or the available reimbursement doesn't cover all of the hospital's fees, our TPL experts take over the claim.

Our TPL team ensures liens are correctly filed according to complex state laws. We file liens against potential insurance settlements, not against patients or their property.

Hospital lien statutes are notoriously complex. Courts have routinely dismissed liens if a provider fails to strictly comply with the filing and notice requirements set forth in the lien statutes. Unfortunately, even if a provider perfects a lien, there are a variety of other issues that may arise under a hospital lien statute. For example, what happens when a provider treats a patient who was injured in a motor vehicle accident in another

state? Is the lien valid against a cause of action in another state? This is a common scenario, especially for providers located near a state's border, but most hospital lien statutes do not explicitly

address this issue. Our attorneys follow case law across the country to ensure we are providing the proper guidance to our clients.

This phase of the process requires extensive communication and follow-up with attorneys, insurance claims adjusters, and other parties. Argos Health advocates on our clients' behalf to ensure that proper payment is realized, always under the oversight of our team of employed attorneys.

While compromise is necessary at times to resolve complex accident claims, hospitals deserve fair and reasonable compensation for the life-saving treatment provided to patients. Therefore, litigation is sometimes required to enforce a hospital's rights. When you work with Argos, this legal work is handled by the same attorneys already involved with the claim. This means they are familiar with the issues and history of these more complex cases. There are no extra fees associated with this legal work. Other firms charge their clients extra when litigation is required and often must use outside law firms because they have no in-house attorneys.

Sometimes what initially looks like a motor vehicle accident claim may turn into a workers' compensation, Medicare, Medicaid, or commercial insurance claim. Argos Health has the

expertise to accurately bill and collect from any payer that is responsible for paying a claim, and we do so until the work is done.

Plaintiffs' Exhibits

# Motor Vehicle Accident Claims Service Video

Watch the video below to learn more about the MVA revenue recovery process.



# Financial Considerations

Argos Health knows that financial managers at hospitals and health systems

"Argos Health does one

thing really well that we

weren't initially accustomed

to; they file a lot of liens.

Plaintiffs' Exhibit 10

are under pressure to keep their accounts receivable under control. MVA claims can take over a year to pay if litigation is involved.

This may exceed the point at which a hospital's financial guidelines require that the claim be written off, have a bad debt reserve recorded, or be passed on to a general AR vendor.

Argos Health can work with your hospital's financial team to develop a custom bad debt reserve policy for

They identify accounts that they can file liens on, and we have picked up a lot from those. The other company we were using did not file as many liens. Argos Health has educated us too on a lot of things, such as the different processes that we were not accustomed to doing."

**DIRECTOR**
February 2020

Selected commentary collected about Argos Health Complex Claims Services May 2020 © 2020 KLAS. Visit klasresearch.com for a complete view.

MVA claims that ensures your business office isn't penalized for taking the time needed to pursue the reimbursement you deserve.

We'll also agree up-front on how much flexibility Argos has in negotiating settlements with plaintiffs' attorneys. This means you'll only need to be involved in the unusual and more complicated situations, and the recovery process will run very efficiently.

Some payer contracts and state laws require that if commercial insurance is available, it should be billed first for an MVA claim. With today's high deductible health plans, Argos can work these

claims even after commercial insurance reimbursement and convert patient responsibility amounts from likely write-offs to revenue.

We recover revenue on MVA claims based on a contingency pricing model. Therefore, you don't pay unless we're successful. Allowing our experts to pursue your MVA claims means that any existing business office staff previously focused on MVA accounts can turn their attention to government and commercial accounts and collect more revenue in those areas.

## But I Already Have a TPL Program...

Given the specialization required to pursue motor vehicle accident and other TPL claims properly, it's not surprising that some hospitals believe they already have an effective program in place when they don't. If any of these are true, you most likely do not have a robust MVA claim process in place:

- You pursue only PIP / Medpay reimbursement for MVA claims
- You or your vendor aren't regularly filing liens against insurance settlements (this doesn't apply in every state)
- You aren't consistently using attorneys to negotiate settlements with auto insurance companies and plaintiffs' attorneys. In some cases, this negotiation is left to the business office, leading to settlements based on misleading or incorrect information

Plaintiff's Exhibits 002

# The Argos Advantage

Argos Health sets itself apart from the competition by accurately and diligently working all claims from beginning to end, regardless of the ultimate source of payment or challenges along the way. Here's one example:

A patient received a motor vehicle accident-related bill for an MRI from a collection agency and disputed the charges. Unfortunately, the collection agency representative was rude and told the patient not to call back.

After reviewing the related claim, it was discovered that the bill was from a radiologist and not the Argos Health client hospital facility. Our team member was able to pull the MRI report and determine the physician involved. Argos contacted the physician's office and updated their billing office with the correct insurance information.

We advised the patient that all necessary corrective action had been taken to resolve the claim correctly.

This was a low dollar claim from a provider that was not even an Argos client, but our dedication to patient satisfaction meant that we went the extra mile for a patient of our client.

# What Makes Argos Different?

Given the specialized knowledge and legal resources required to

properly collect all the revenue a hospital deserves on motor vehicle accident claims, outsourcing is the answer. What makes Argos Health different compared to other vendors who provide MVA services?

## Expertise and Experience

Our staff and attorneys have represented hospitals, health systems, and individual patients in these types of cases for many years. We maintain strong and professional relationships with our clients, attorneys, and insurers. Consequently, we're able to efficiently and expeditiously resolve claims. Our legal experts have even been called upon to assist in drafting state lien laws.

We're also advocates for the healthcare industry. We have filed several lawsuits that have resulted in favorable rulings for healthcare providers when insurers fail to properly follow the requirements of the lien laws.

## All-inclusive Fees

Unlike other MVA vendors, our attorneys are fully involved in all negotiations, and our legal fees are included in our contingency rate, even if litigation is required. Other firms charge their

clients for lien filing fees, postage, and other expenses that can add as much as another third to their total cost. The Argos Health contingency rate is all-inclusive.

## A True Partner

We will review customer-managed care contracts for free to ensure hospitals are properly coordinating benefits for motor vehicle accident claims and that all payers are making the payments they are obligated to make. In addition, we will also review and suggest edits to our clients' assignment of benefits form to enhance prompt payment directly to the provider from all available sources.

## Technology

We've developed proprietary predictive analytics models that allow us to quickly determine if an MVA claim is likely to result in reimbursement. This can help us when working with a hospital to decide whether it makes sense to allow a timely filing deadline for a commercial payer to pass to pursue an MVA settlement to the end. At the front end of the process, our software can identify claims that should be immediately submitted to another payer or the patient. By making the determination as early as possible, there is a better chance for the hospital to receive payment on the claim from the proper source.

## We're Complex Claims Experts, Not Just MVA Experts

Argos Health offers other complex claims services besides motor vehicle accident claim revenue recovery, allowing a hospital to centralize the management of multiple types of

challenging claims with a single vendor if desired.

Many clients recognize the advantage this provides. An MVA claim may start down one path and end up being paid by any number of payers. Once we are referred an MVA or other complex claim, we'll work with the appropriate payers until all revenue is recovered.

### *A Focus on Patient Satisfaction*

A victim of a motor vehicle accident is very likely suffering from both pain and confusion related to the insurance process. We've spoken with thousands of patients in this circumstance, and we realize their concerns and needs. We patiently explain the process and help them to understand how a small amount of cooperation can mean a quick resolution and no out-of-pocket expense related to their medical care.

### *Proven Success*

We can demonstrate prior success in resolving complex MVA and other TPL claims. Ask us for references.

# Motor Vehicle Accident Claims White Paper

*A Road Map for Simplifying Motor Vehicle Accident Claims and*

**Get My White Paper Now**

(This is all there is to enter)

First Name:
Last Name:

*Maximizing Revenue Recovery*

Email:

Organization:

Title:

State:

We respect your [email privacy (https://www.aweber.com/permission.htm)](https://www.aweber.com/permission.htm)

Download our white paper to better understand how the odds are stacked against the provider when it comes to MVA claims since almost all such claims involve legal issues unrelated to the care of patients.

The white paper covers the following topics:

- An overview of the MVA claim payment process
- A description of the challenges hospitals face when pursuing motor vehicle accident claims
- The impact of the registration process on MVA reimbursement
- The importance of state lien laws
- How coordination of benefits affects MVA reimbursement
- Why attorney involvement in the negotiation process is key
- And more...

Download the white paper right now and start learning why motor vehicle accident claims are some of the most complicated for a hospital to address.

Plaintiff's Exhibits 003

# MVA Sales Sheet

MOTOR VEHICLE ACCIDENT SERVICES

## There are a lot of moving parts involved in pursuing reimbursement of MVA claims. **Let us do the heavy lifting.**

By utilizing a specialized RCM outsourcing firm with the expertise and resources to get the job done right, hospitals are positioning themselves for success.

### We are here to help.

**Motor Vehicle Accident (MVA)** claims are complex, time consuming, and the cost to collect often makes these accounts unprofitable unless handled correctly. .

**These accident claims are among some of the most difficult to navigate,** and hospitals often find their internal staff lacks the expertise to fully process these burdensome accounts. The odds are stacked against the provider, because almost all such claims involve legal issues unrelated to the care of patients.

**We have the ability to optimize reimbursement,** due to our broad understanding of the challenges facing all parties involved. From state lien laws to coordination of benefits, our team of experts focuses on the details of these nuances for the provider.

**THE ARGOS HEALTH SOLUTION**



**SIMPLIFY**
Accident claims can be extremely complex and time consuming for a billing office to handle. We simplify the complex claims process with unparalleled service.



**IDENTIFY**
It's critical to find as much information as possible about the accident and to do so in a timely manner. We focus on the details so you don't have to.



**COORDINATE**
MVA claims can involve multiple payers who may be responsible for payment. We navigate the complex issues affecting a hospital's ability to receive full reimbursement on these claims.



**NEGOTIATE**
Hospitals deserve fair and reasonable compensation for the treatment provided. Our ability to negotiate claim resolution while leveraging all legal rights results in optimal reimbursement.

*As the world of healthcare grows increasingly complex, your claims inventory doesn't have to.*


argoshealth

complexclaims.com

(/salessheets/Argos-Health-MVA-Sales-Sheet.pdf)Click here (/salessheets/Argos-Health-MVA-Sales-Sheet.pdf) to download our third party liability / motor vehicle accident revenue recovery service sales sheet.

# Frequently Asked Questions

*What does it cost to get started with your service?*

We have no implementation fees, and we perform our work on a contingency basis.

*Do you require a client to provide a minimum volume of MVA claims?*

We have no minimum claim volume or client size requirements. Depending on its location, a small hospital may have a large number of motor vehicle accident claims. At the other end of the spectrum, we work with large health systems, as well.

*Do I need to find a place for Argos staff to work at my hospital?*

Absolutely not. While other vendors place staff at their client hospitals, our claim assignment logic means that we'll identify the right claims to work automatically. Our team won't be taking up space at your facility, complicating the registration process, or asking patients additional financial questions when they are in a painful and stressful situation after an accident.

*How do you recover such high reimbursement for MVA claims when we can't?*

Several reasons. We employ dedicated teams for each complicated step in the process and can apply more resources to getting these complex claims paid than any hospital can

reasonably be expected to. Payers, plaintiffs' attorneys, and insurance adjusters know the Argos team are experts in the MVA claim process and are less likely to throw up common roadblocks when dealing with us. Finally, our attorneys work with our clients to review their assignment of benefits and other key documents to ensure the hospital secures its rights to payment at the very start of the revenue cycle.

 (https://twitter.com/argoshealth)     (https://www.linkedin.com/company/16182666)

Copyright © 2017–2020 Argos Health, Inc. All rights reserved.
Privacy Policy (/privacy-policy)

## NOTICE OF MEDICAL LIEN
## N.C.G.S. §§ 44-49 & 44-50

TO:   STATE FARM INSURANCE
       ATTN: CLAIMS DEPARTMENT

RE:   YVONNE BERTOLO
       PATIENT NO: ▮▮▮▮▮

    TAKE NOTICE that WakeMed and WakeMed Specialty Physicians, pursuant to N.C.G.S. §§ 44-49 & 44-50, hereby asserts a medical lien in the amount of $8,571.60 upon any sums recovered as damages for personal injury in any civil action, and upon all funds paid to any person in compensation for or settlement of the injuries, whether in litigation or otherwise, for any drugs, medical supplies, ambulance services, services of any physician or nurse or hospital and hospital attention and/or hospital services, any of which was rendered by WakeMed and WakeMed Specialty Physicians in connection with the injury for which the sums or funds are recovered or paid to YVONNE BERTOLO for his/her initial admission of October 15, 2019 and all subsequent admissions to a WakeMed and WakeMed Specialty Physicians facility. The term "sums" includes all types of liability, uninsured, underinsured, medpay, PIP, and umbrella coverages.

    This the 15th day of November, 2019.

                   _Heather Finch_

                   Heather Finch
                   On behalf of WakeMed and WakeMed Specialty Physicians

                   720 Saint Sebastian Way, Ste 120
                   Augusta, Georgia 30901
                   hfinch@argoshealth.com
                   (706) 955-7452, Ext. 615



EXHIBIT
9


Claim:089468273

# NOTICE OF MEDICAL LIEN
## N.C.G.S. §§ 44-49 & 44-50

TO:   PENNSYLVANIA NATIONAL INSURANCE-HARRISBURG
      ATTN: AMBER CAUDLE

RE:   PEGGY ELROD
      PATIENT NO: ███████

        TAKE NOTICE that WakeMed and WakeMed Specialty Physicians, pursuant to
N.C.G.S. §§ 44-49 & 44-50, hereby asserts a medical lien in the amount of $20,065.48 upon
any sums recovered as damages for personal injury in any civil action, and upon all funds paid
to any person in compensation for or settlement of the injuries, whether in litigation or
otherwise, for any drugs, medical supplies, ambulance services, services of any physician or
nurse or hospital and hospital attention and/or hospital services, any of which was rendered by
WakeMed and WakeMed Specialty Physicians in connection with the injury for which the
sums or funds are recovered or paid to PEGGY ELROD for his/her initial admission of
April 05, 2019 and all subsequent admissions to a WakeMed and WakeMed Specialty
Physicians facility. The term "sums" includes all types of liability, uninsured, underinsured,
medpay, PIP, and umbrella coverages.

        This the 25th day of April, 2019.


                        Jessica Cantrell
                        On behalf of WakeMed and WakeMed Specialty Physicians


                        720 Saint Sebastian Way, Ste 120
                        Augusta, Georgia 30901
                        jcantrell@argoshealth.com
                        (706) 955-7464, Ext. 623

## NOTICE OF MEDICAL LIEN
## N.C.G.S. §§ 44-49 & 44-50

TO:   GEICO
      ATTN: REBECCA MCFALL


RE:   PEGGY ELROD
      PATIENT NO: ████


        TAKE NOTICE that WakeMed and WakeMed Specialty Physicians, pursuant to
N.C.G.S. §§ 44-49 & 44-50, hereby asserts a medical lien in the amount of $15,065.48 upon
any sums recovered as damages for personal injury in any civil action, and upon all funds paid
to any person in compensation for or settlement of the injuries, whether in litigation or
otherwise, for any drugs, medical supplies, ambulance services, services of any physician or
nurse or hospital and hospital attention and/or hospital services, any of which was rendered by
WakeMed and WakeMed Specialty Physicians in connection with the injury for which the
sums or funds are recovered or paid to PEGGY ELROD for his/her initial admission of April
05, 2019 and all subsequent admissions to a WakeMed and WakeMed Specialty Physicians
facility. The term "sums" includes all types of liability, uninsured, underinsured, medpay, PIP,
and umbrella coverages.

        This the 18th day of March, 2020.


                          _Susan Ward_
                          Susan Ward
                          On behalf of WakeMed and WakeMed Specialty Physicians
                          720 Saint Sebastian Way, Ste 120
                          Augusta, Georgia 30901
                          sward@argoshealth.com
                          (706) 955-7452, Ext. 634

## NOTICE OF MEDICAL LIEN
## N.C.G.S. §§ 44-49 & 44-50

TO: STATE FARM INSURANCE
ATTN: SANDRA REID

RE: JUSTIN PALMER
PATIENT NO: ███████

· TAKE NOTICE that WakeMed and WakeMed Specialty Physicians, pursuant to N.C.G.S. §§ 44-49 & 44-50, hereby asserts a medical lien in the amount of $3,267.31 upon any sums recovered as damages for personal injury in any civil action, and upon all funds paid to any person in compensation for or settlement of the injuries, whether in litigation or otherwise, for any drugs, medical supplies, ambulance services, services of any physician or nurse or hospital and hospital attention and/or hospital services, any of which was rendered by WakeMed and WakeMed Specialty Physicians in connection with the injury for which the sums or funds are recovered or paid to JUSTIN PALMER for his/her initial admission of April 26, 2019 and all subsequent admissions to a WakeMed and WakeMed Specialty Physicians facility. The term "sums" includes all types of liability, uninsured, underinsured, medpay, PIP, and umbrella coverages.

This the 18th day of June, 2019.

*Shanece Price*
Shanece Price
On behalf of WakeMed and WakeMed Specialty Physicians

720 Saint Sebastian Way, Ste 120
Augusta, Georgia 30901
sprice@argoshealth.com
(706) 955-7452, Ext. 630



*Your Revenue Cycle Partner for Complex Claims*



June 18, 2019

Ms. Janine Palmer, Guarantor
Justin Palmer, Minor
2321 Knoll Ridge Ln
Wake Forest, NC  27587

      Re:    Date(s) of Admission: 4/26/2019
              Total Charges: $3,267.31

Dear Ms. Palmer:

      Argos Health, Inc. represents WakeMed and WakeMed Specialty Physicians regarding payment of the charges referenced above.  It is our understanding these charges were for treatment of injuries caused by a third party.

      North Carolina law allows a hospital to assert a lien on any payments you may be entitled to receive from any liability, medical payments and/or uninsured/underinsured motorist insurance coverage.  Please understand this is NOT a lien against you individually, or any of your property or assets, nor is it evidence of any failure on your part to pay a debt.  Enclosed is a formal notice of the lien as required under N.C.G.S. §§ 44-49 & 44-50.

      Please contact us if you have any questions.

            Sincerely,

            *Shanece Price*

            Shanece Price
            sprice@argoshealth.com

cc:    State Farm Insurance, Attn: Sandra Reid (**Claim No. 338609N10**)
      *(Via facsimile (855) 820-6318)*

Case 5:20-cv-00413-FL    Document 64    Filed 11/17/20    Page 73 of 79

720 St. Sebastian Way, Suite 120, Augusta, GA 30901 • P: 877.881.9744 • F: 706.955.7468 • argoshealth.com

**The Law Office of**
**Colon &**
**Associates, PLLC.**



January 9, 2020

**VIA USPS CERTIFIED**
**TRACKING # 7019 0160 0000 3665 6842**

Argos Health, Inc.
Attn: Whitney Swogger
720 Saint Sabastian Way, Suite 120
Augusta, GA 30901

> **RE:** *Auto Insurance Med Pay for our Client, Yvonne Bertolo*
> *with WakeMed and WakeMed Specialty Physicians:*

Dear Ms. Swogger:

It has come to my attention that the Wake Med Emergency Room has implemented a policy of having emergency room patients execute an assignment of benefits to WakeMed and WakeMed Specialty Physicians at the time of treatment. Thereafter, WakeMed is then contacting the patients' auto insurers and requesting that it submit the patient's med pay directly to WakeMed and WakeMed Specialty Physicians. Thus far, our client Yvonne Bertolo had a $2,000.00 med pay with Allstate. Our office recently received a med pay check from Allstate on behalf of Yvonne Bertolo made payable to Wake Med and Law Office of Colon & Associates, PLLC in the amount of $2,000.00 based upon an alleged agreement Ms. Bertolo signed on the day she received emergency room treatment at Wake Med. For your convenience and your reference, attached is a highlighted copy of the documents we received on behalf of Ms. Bertolo marked as Exhibit 1.

As I am sure you are aware, auto insurance med pay is a contractual agreement between an insurer and insured and is paid directly to the insured once the requirements for this benefit are met. After an insured receives a check for med pay, then she can use the funds from this benefit in any manner she chooses. A hospital's treatment of an emergency room patient is not contingent on whether or not the patient agrees to assign her med pay benefit to a third-party medical provider. Additionally, we do not believe patients arriving at a hospital for emergency treatment are in any condition to enter into legally-binding agreements for a host of reasons.

A patient certainly has the right to assign her med pay to a third-party medical provider at a later date after receiving emergency room treatment; however, I believe the patient should have prior notice in writing that she is under no such legal obligation to assign her med pay benefit to any third-party medical provider. I believe WakeMed's policy as outlined above is against public policy and gives rise to other legal issues.



**EXHIBIT**
**10**

833 B Wake Forest Business Park, Wake Forest, NC 27587          Phone: (919) 556-7446 ✦ (919) 556-7424 ✦ Fax: (919) 556-5887

Therefore. ==I ask that WakeMed please review its currently policy regarding this matter and kindly inform the insurance company to issue a check payable directly to Ms. Bertolo.==

Sincerely.

Arlene L. Colon

Enclosures (1)
cc: Client

2



**The Law Office of**

**Colon & Associates, PLLC.**



January 9, 2020

**VIA USPS CERTIFIED MAIL**
**TRACKING # 7019 0160 0000 3665 6859**

Argos Health, Inc.
Attn: Whitney Swogger
720 Saint Sabastian Way, Suite 120
Augusta, GA 30901

RE: *Auto Insurance Med Pay for Peggy Elroy*
*Obtained by WakeMed and WakeMed Specialty Physicians:*

Dear Ms. Swogger:

It has come to my attention that the Wake Med Emergency Room has implemented a policy of having emergency room patients execute an assignment of benefits to WakeMed and WakeMed Specialty Physicians at the time of treatment. Thereafter, WakeMed is then contacting the patients' auto insurers and requesting that it submit the patient's med pay directly to WakeMed and WakeMed Specialty Physicians. Upon such contact, WakeMed received Ms. Elrod's $5,000.00 med pay from Penn National, which WakeMed claimed to be based upon an assignment Ms. Elrod signed on the day treatment was rendered upon her at WakeMed's emergency room.

As I am sure you are aware, auto insurance med pay is a contractual agreement between an insurer and insured and is paid directly to the insured once the requirements for this benefit are met. After an insured receives a check for med pay then she can use the funds from this benefit in any manner she chooses. A hospital's treatment of an emergency room patient is not contingent on whether or not the patient agrees to assign her med pay benefit to a third-party medical the provider. Additionally, I do not believe patients arriving at a hospital for emergency treatment are in any condition to enter into legally-binding agreements for a host of reasons.

A patient certainly has the right to assign her med pay to a third-party medical provider at a later date after receiving emergency room treatment; however, I believe the patient should have prior notice in writing that she is under no such legal obligation to assign her med pay benefit to any third-party medical provider. I believe WakeMed's policy as outlined above is against public policy and gives rise to other legal issues.



833 B Wake Forest Business Park, Wake Forest, NC 27587    Phone: (919) 556-7446 ♦ (919) 556-7424 ♦ Fax:(919) 556-3887

Therefore, I ask that WakeMed please review its currently policy regarding this matter and kindly return or reimburse Ms. Elrod's med pay check in the amount of $5,000.00 payable to her only.

Sincerely,

Arlene L. Colon

cc: Clients

2



Your Revenue Cycle Partner for Complex Claims

February 5, 2020

*Via facsimile only (919) 556-3887*

Ms. Arlene Colon, Esq.
Colon & Associates, PPLC
833 Durham Road
Wake Forest, NC 27587

| | Re: | Your Client: | Yvonne Bertolo |
|---|---|---|---|
| | | My Client: | WakeMed and WakeMed Specialty Physicians |

Dear Ms. Colon:

I am in receipt of your recent letter regarding the medpay payment for your client, Yvonne Bertolo. As you know, our office represents WakeMed and WakeMed Specialty Physicians ("WakeMed") regarding hospital liens perfected in accordance with N.C. Gen. Stat. §44-49 et. seq. and pursuing medpay funds under assignments of benefits.

As you have pointed out, Ms. Bertolo executed a valid assignment of benefits, which is a contractual agreement enforceable under North Carolina law. The Court of Appeals upheld a similar assignment of benefits in *Alaimo Family Chiropractic v. Allstate*, 574 S.E.2d 496, 498-499 (2002). The circumstances of that case are very comparable in that John MacEwan, a person injured in a motor vehicle collision, sought treatment for injuries sustained in that collision. MacEwan executed an assignment of benefits and the Court held that the assignment was enforceable. Allstate failed to honor the assignment and instead paid MacEwan. Because the assignment was valid and enforceable under North Carolina contract law, Allstate had to make payment to the assignee Alaimo.

For those reasons, I cannot recommend that WakeMed void its enforceable assignment of benefits.

With kind regards, I am

Very truly yours,

Matthew W. Matson, Esq.

720 St. Sebastian Way, Suite 120, Augusta, GA 30901 • P: 877.861.9744 • F: 706.955.7468 • argoshealth.com

Plaintiffs Exhibits 040

**The Law Office of**

**Colon & Associates, PLLC.**



February 12, 2020

**VIA FACSIMILE (706) 617-6307 AND**
**FIRST CLASS MAIL**

Argos Health, Inc.
Attn: Matthew Matson
720 Saint Sabastian Way, Suite 120
Augusta, GA 30901

RE:     *Auto Insurance Med Pay for our Client Yvonne Bertolo:*

Dear Mr. Matson:

Thank you for your February 5, 2020 response to our letter dated January 9, 2020 regarding our Clients' auto insurance med pay with WakeMed and WakeMed Specialty Physicians (WakeMed), marked and incorporated herein as *Exhibits 1 and 2* respectively. Contrary to your letter dated February 5, 2020, I did not state that Ms. Bertolo executed a valid assignment of benefits, which is a contractual agreement enforceable under North Carolina law. Those are your words. To the contrary, I stated any such agreement was unenforceable under the circumstances.

Additionally, *Alaimo Family Chiropractic v. Allstate, 574 S.E.2d 496* (2002) (marked and incorporated herein as *Exhibit 3*) is distinguishable in the present case. The patient who assigned his benefits in *Alaimo* was not under a contractual agreement with Allstate, and more importantly, did not assign his benefits to a hospital while seeking emergency room treatment immediately following, and on the day of, an automobile accident. Moreover, as held in *Alaimo*, the "principles of general contract law determine whether an assignment is valid." I believe this assignment on its face is an invalid and unenforceable agreement.

Thank you and we will proceed accordingly given WakeMed's position.

Sincerely,

Arlene L. Colon

Enclosures (3)

cc: Client
    File



833 B Wake Forest Business Park. Wake Forest. NC 27587          Phone: (919) 556-7446 ✦ (919) 556-7424 ✦ Fax:(919) 556-3887