IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-413-FL

| | | |
|---|---|---|
| PEGGY ELROD; YVONNE BERTOLO; JANINE PALMER; JUSTIN PALMER; and ALL SIMILARLY SITUATED PERSONS WITHIN THE PROPOSED CLASS, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| WAKEMED; WAKEMED SPECIALTY PHYSICIANS, LLC D/B/A WAKEMED PHYSICIAN PRACTICES; WAKEMED SPECIALISTS GROUP, LLC D/B/A WAKEMED PHYSICIAN PRACTICES; ARGOS HEALTH, INC.; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; PENNSYLVANIA NATIONAL MUTUAL INSURANCE COMPANY; UNKNOWN DEFENDANTS 1 THROUGH 25, | ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) | |

This putative class action challenging emergency room billing practices is before the court on

defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

(DE 73, 75, 81, 83). The motions have been briefed fully, and in this posture the issues raised are

ripe for ruling. For the following reasons, the motions are granted.[1]

---

[1] Also pending is plaintiffs' motion for leave to file sur-sur-surreply (DE 117), which is granted.

**STATEMENT OF THE CASE**

Plaintiffs commenced this action in Wake County Superior Court on July 2, 2020, asserting common law claims seeking to set aside agreements for assignment of insurance benefits they executed at a hospital emergency room operated by defendants WakeMed, WakeMed Specialty Physicians, LLC, and WakeMed Specialists Group, LLC (collectively, "defendant WakeMed"). WakeMed filed a notice of removal in this court on July 28, 2020, on the basis that the complaint raises a substantial question as to the proper interpretation of federal law, including, the Emergency Medical Treatment and Labor Act, 42 U.S.C. §1395dd, as well as statutes and regulations governing Medicare, 42 U.S.C. § 1395 et seq.

Plaintiffs filed the operative amended complaint on November 20, 2020, asserting the following claims: 1) declaratory judgment against all defendants; 2) breach of fiduciary duty against defendant WakeMed; and 3) fraud, conversion, and unfair and deceptive trade practices against defendants Argos Health, Inc. ("Argos") and WakeMed.[2] As for relief, plaintiffs seek to "rescind or for the Court to set aside or strike the contractual provisions complained of within [a] general consent form at issue." (Compl. p. 35).[3] Plaintiffs also seek to have the court impose a constructive trust upon defendants WakeMed and Argos "to be funded with the monies and insurance proceeds improperly collected from the Plaintiffs and proposed class members, such amounts to be returned to Plaintiffs and the proposed class members, with interest." (Id.). Plaintiffs seek certification as a class action, compensatory, trebled, and punitive damages, as well as interest and fees.

---

[2]     In the meantime, plaintiffs moved to remand the case to state court on August 26, 2020, but plaintiffs withdrew that motion on February 25, 2021. In addition, defendants moved to dismiss the original complaint, but the court denied those motions as moot on November 30, 2020, after plaintiffs filed the operative amended complaint.

[3]     Hereinafter, all references to the complaint, or citations to "Compl.," are to the operative amended complaint (DE 65).

2

Defendants Allstate Property and Casualty Insurance Company ("Allstate") and Pennsylvania National Mutual Insurance Company ("Penn National") filed their instant motions to dismiss, seeking dismissal for lack of jurisdiction and failure to state a claim. Defendant Argos filed its instant motions to dismiss for failure to state a claim, and defendant WakeMed seeks dismissal on the same basis and for lack of jurisdiction. In support of that part of its motion to dismiss for lack of jurisdiction, WakeMed relies upon an affidavit of Liz Watson ("Watson") who is "revenue cycle" director for WakeMed. (DE 83-1).

Plaintiffs responded in opposition to the motions to dismiss by defendants Allstate and Penn National, relying upon a Medicare claim detail, as well as correspondence between Argos, the insurance defendants, and plaintiffs. Plaintiffs responded in opposition to defendant WakeMed's motion to dismiss, relying upon correspondence from two doctors who treated plaintiff Justin Palmer. Plaintiffs responded in opposition to defendant Argos's motion to dismiss. Shortly thereafter WakeMed and Argos replied.

Following submission of the instant motions in April 2021, plaintiffs filed a surreply and defendant WakeMed filed a sur-surreply, with leave of court. Finally, plaintiffs filed the instant motion for leave to file a sur-sur-surreply on August 3, 2021, accompanied by a proposed sur-sur-surreply.

**STATEMENT OF THE FACTS**

The facts alleged in the complaint may be summarized as follows.

Plaintiff Peggy Elrod ("Elrod") was involved in a motor vehicle accident on April 5, 2019, "and sought treatment that same day at one of [d]efendant WakeMed's emergency rooms." (Compl. ¶ 63). When she arrived at the emergency room, "she was terrified and in a panicked state because

of potential internal bleeding complications stemming from her single-lead pacemaker and blood-thinning medication; complications posing a significant threat to life or function." (Id. ¶ 65).

"Notwithstanding, . . . [p]laintiff Elrod was presented with numerous forms that needed to be signed in order for her to receive emergency medical treatment." (Id. ¶ 66). "Most of these forms were not presented to her in paper format, but rather were merely pulled up on [d]efendant WakeMed's employee's computer screen as the employee briefly mentioned what each form was, and directed [p]laintiff Elrod to sign the electronic signature pad." (Id.).

"One of the electronic documents signed by [p]laintiff Elrod at [d]efendant WakeMed's emergency room during this process was [a] 'general consent' form" out of which this action arises (the "general consent form"). (Id. ¶ 67). The general consent form is comprised of 13 enumerated paragraphs, beginning with the first five as follows:

1 **Consent for Diagnosis and Treatment:** I hereby consent to the provision of all medical treatment and other health care that my physician(s) or other caregivers consider necessary, which may include diagnostic, radiology, and laboratory procedures provided to me at any WakeMed location. I understand that this consent is valid for up to two years. If I am or may be pregnant, I agree to tell my practitioner and hereby consent to radiology imaging (e.g. x-ray, CT, etc.) and other treatment, as agreed with my practitioner.

2 **Independent Practitioners and Students:** I understand and agree that many physicians and other individuals involved in my care at WakeMed are <u>independent contractors</u> in private practice, are <u>not employed by WakeMed</u>, and that <u>WakeMed is not liable</u> for their acts or failures to act. This includes, but is not limited to: <u>emergency room, anesthesia, radiology, and laboratory physicians and other practitioners; students, interns, residents, and fellows; constant observers; and many other physicians, health care providers, and non-clinical staff</u>. I understand that I may receive separate bill(s) from one or more independent providers or groups who were involved with my care. I also recognize that WakeMed is a teaching institution, and I agree that students training to be physicians, nurses, or other health care professionals may assist in providing my care.

3 **Use and Release of Medical Information:** I acknowledge that WakeMed, its staff, and other independent physicians and health care professionals involved in providing my care at WakeMed are authorized to use and release my medical information for purposes of treatment, payment and health care operations as stated in WakeMed's Notice of Privacy Practices.

4 **Patient's Certification:** I certify that the information provided in applying for payment under Medicare, Medicaid, or any other government programs or insurance benefits is complete and accurate in all respects and agree that I am financially responsible to WakeMed if it is not.

5 **Guaranty of Payment:** I understand that I will be financially responsible for and hereby agree to pay and to guarantee payment in full of any and all charges for services provided by WakeMed, independent groups, physicians, or other health care professionals involved in providing treatment or consultation to me, even if such treatment is not covered by insurance. In the event of nonpayment, I agree to pay, and do hereby guarantee the payment of, all costs of collection, including reasonable attorneys' fees. I understand that my bill(s) will be sent to the address on file unless I submit a complete written request for my bill(s) to be sent to an alternate address.

4

(Compl. Ex. 2 (DE 65-3) at 1).  The general consent form then continues with the following four

paragraphs, including an "Irrevocable Assignment of Insurance Benefits" (hereinafter, the

"assignment of benefits"), which is the focus of plaintiffs' claims in this case:

**6**   **Irrevocable Assignment of Insurance Benefits:** I, on behalf of myself and the patient, in consideration of health care services provided, voluntarily and irrevocably assign and authorize direct payment of all surgical and medical benefits directly to WakeMed and WakeMed Physician Practices (WPP). I also authorize payment of applicable benefits directly to all physicians or other practitioners involved in my care, including but not limited to independent physicians and groups practicing at WakeMed (e.g. emergency medicine, radiology, anesthesia, laboratory/pathology, and certain surgeons, physicians, and other practitioners and groups). Benefits assigned shall include, but may not be limited to, major medical insurance, liability insurance (including excess, umbrella and automobile uninsured/underinsured coverages), medpay and personal injury protection (PIP) benefits.

**7**   I understand this assignment means that WakeMed can and will seek and receive direct payment from any potential insurer or other payment source, which may limit what I can recover personally for my injury. I further understand that until my charges are properly paid by some insurer, I and the patient remain personally responsible for all charges. I authorize WakeMed, as necessary, to endorse benefit checks made payable to me and/or WakeMed or independent practitioner(s). I understand and agree that in carrying out these functions, WakeMed is acting for its own benefit to obtain payment and is not required to act for my benefit. I further understand that should any of my charges not be covered by any insurer for any reason, including a determination that they were not medically necessary, I and the patient remain personally responsible for full payment. If my health insurer is not the entity making payment, I agree that any contractual discount may not apply.

**8**   **Overpayments and Refunds:** I authorize return or payment of any overpayment received within WakeMed's sole discretion. If any refund becomes due to me or to the patient, I authorize WakeMed to apply any such amount(s) to any charges that remain outstanding for services provided to me or the patient (or for which either of us is legally responsible) at any time as allowed by law.

**9**   **Assertion of Lien:** I, for myself and the patient, voluntarily and irrevocably agree that, if any claim or lawsuit is made against any liability, medpay, uninsured, or underinsured motorist insurance coverage(s) related to injuries/loss for which I received care at any WakeMed or WPP location, WakeMed may seek and perfect a lien against said claim and/or recovery to the fullest extent allowed by law and may seek payment of its full and undiscounted charges from any and all proceeds to be paid from any of the insurance coverage set out above. I, for myself and the patient, further agree to provide WakeMed with the name, address, policy number and claim number for every insurance carrier that may provide liability, medpay, uninsured and underinsured insurance coverages. I understand that if I fail to do so, I may be responsible personally for WakeMed undiscounted charges and the charges of other professionals who provide care and treatment.

(Id.).  The final four enumerated paragraphs of the general consent comprise provisions for release of

liability for valuables, termination of consent, "White Board" consent, and "Rehab Hospital"

information.  (Id. at 2).

The thirteen enumerated paragraphs are followed by an attestation as follows:

**I understand and agree to the above statements, releases, authorizations, and assignments of benefits. If I am signing this for a patient other than myself, any reference to "I" or "me" includes me and the patient.**

Signature (Seal): _____ Date: _____ Time: _____ Guardian or Representative, if any: _____
*(Patient or legal guardian/closest available relative/authorized representative, if patient unable to sign)*         *(Please print name)*

Signature (Seal): _____ Date: _____ Time: _____
*(Insured/Guarantor, if different from Guardian/Relative/authorized representative)*

Name of Insured/Guarantor or Representative, if any:  (printed) _____

5

(Id.).  Because plaintiff Elrod signed on a touch screen, her signatures and printed name appear as follows in the medical record:



(Compl. Ex. 6 (DE 65-6) at 2).

Plaintiff Elrod received "emergency treatment on the day of the accident," and she again visited defendant WakeMed's "emergency room . . . for emergency medical care believed to be a result of the accident," on April 22, 2019.  (Compl. ¶¶ 68-69 n. 18).  "Defendant WakeMed generated charges at the undiscounted rate totaling $19,314.48 for [p]laintiff Elrod's emergency treatment on the day of the accident," and charges $751.00 for her care on April 22, 2019, totaling $20,065.48 in aggregate charges.  (Id.).

On the dates of her motor vehicle accident and treatment, plaintiff Elrod "had a motor vehicle insurance policy with [defendant] Penn National that included . . . coverage of $5,000" for "medical payments," also referenced in the complaint as "Med Pay coverage," and "Med Pay automotive insurance benefits."  (Id. ¶¶ 29, 64, 91d).  On April 25, 2019, defendant Argos, allegedly "representing itself as an agent of WakeMed, faxed a claim on behalf of [p]laintiff Elrod to [defendant] Penn National for the $20,065.48, stating in pertinent part: 'Attached is a valid North Carolina Lien, UB's for med pay/PIP coverage, and an executed Assignment of Benefits.'"  (Id. ¶

69).[4]  According to the complaint, on April 26, 2019, defendant Penn National "issued a check for $5000 to WakeMed and WakeMed Specialty Physicians, completely exhausting [p]laintiff Elrod's coverage under the MedPay provisions in her motor vehicle insurance policy." (Id. ¶ 70).

Plaintiff Justin Palmer had a similar experience with treatment in defendant WakeMed's emergency room.  According to the complaint, "[o]n April 26, 2019, [plaintiff] Justin Palmer was seventeen years old and driving a vehicle with two of his friends inside when another vehicle severely T-boned [his] vehicle in an intersection, rendering [him] unconscious and bleeding as his friends pulled him from the mangled vehicle."  (Id. ¶ 71).  "Upon receiving a phone call, [plaintiff] Justin Palmer's mother, [plaintiff] Janine Palmer, rushed to the scene of the accident and witnessed her son bleeding from his head, while [emergency medical] personnel applied a neck brace before loading him onto a gurney, strapping him down, and loading him into an ambulance." (Id. ¶ 73).  "Thereafter, [p]laintiff Janine Palmer rode in the back of the ambulance with [plaintiff] Justin [Palmer] to [d]efendant WakeMed's emergency room while [emergency medical] personnel administered immediate treatment."  (Id.).

"Upon arrival at Defendant WakeMed's emergency room, [plaintiff Janine] Palmer witnessed WakeMed's employees cut off her son's clothing and begin to remove the shards of glass embedded in [his] arm, shoulder, and head."  (Id. ¶ 74).  According to the complaint, plaintiff Janine Palmer "was then escorted to a small room by an employee of [d]efendant WakeMed and was directed to sign numerous patient registration documents while her son was being treated in an adjacent room." (Id. ¶ 75).  "Defendant WakeMed's employee also brought a Clergyman into the room while [plaintiff Janine] Palmer was signing the documents, whose presence alone greatly intensified [her] anxiety

---

[4]  Plaintiffs do not attach to the complaint a copy of the referenced faxed claim.  The complaint specifies elsewhere that "PIP" stands for "personal injury protection," and "UB" stands for "Uniform Billing Form."  (Compl. ¶¶ 61 n. 17, 69, 37 n.12).

7

and gravity of the critical emergency medical treatment her son required in the adjacent room." (Id. ¶ 76). According to the complaint, "[a]t the time [plaintiff Janine] Palmer signed the numerous documents at the direction of Defendant WakeMed's employee, she was in a state of complete panic and signed the documents under the belief that time was of the essence and any delay in signing the forms would delay her son's critically needed treatment." (Id. ¶ 77).

One of the documents signed by plaintiff Janine Palmer was the general consent form, with the same assignment of benefits language as the general consent form signed by plaintiff Elrod. (Id. ¶ 78). Plaintiff Janine Palmer, however, signed the form on paper, rather than electronically, and she signed as plaintiff Justin Palmer's mother, on behalf of Justin Palmer. (Compl. Ex. 7 (DE 65-8) at 2). On the date of his motor vehicle accident and treatment, plaintiff Justin Palmer "was a named insured on his mother's automotive policy issued through [defendant] Allstate that contained $1000 of MedPay coverage, payable to the insured and each passenger in [his] vehicle." (Compl. ¶ 72). According to the complaint, "[d]efendants represented this 'general consent' form, signed by [plaintiff Janine] Palmer, to [defendant] Allstate as a valid assignment of benefits in order to exhaust [plaintiff Janine] Palmer's MedPay coverage." (Id. ¶ 80). The complaint does not state whether defendant Allstate made any payment to WakeMed.

Finally, plaintiff Yvonne Bertolo ("Bertolo") had a similar experience with treatment in defendant WakeMed's emergency room. On October 15, 2019, she was "involved in a motor vehicle accident . . . and sought treatment that same day at one of WakeMed's . . . emergency rooms for injuries she sustained in the accident." (Id. ¶ 55). According to the complaint, "[u]pon arrival, Plaintiff Bertolo was in severe pain, reported a foggy memory surrounding the [motor vehicle accident] and uncertainty as to whether she had lost consciousness as a result of the collision." (Id. ¶ 56). "During the registration process at [d]efendant WakeMed's emergency room, [p]laintiff Bertolo

8

was directed to sign numerous documents and forms that were visible only on the WakeMed employee's computer screen, whereby the employee briefly mentioned to [p]laintiff Bertolo what each form was, and directed her to sign by way of an electronic signature pad." (Id. ¶ 58).

One of the documents signed by plaintiff Bertolo was the general consent form, with the same assignment of benefits language as the general consent form signed by plaintiffs Elrod and Janine Palmer. (Id. ¶ 59). On the date of her motor vehicle accident and treatment, plaintiff Bertolo "had a motor vehicle insurance policy through [defendant] Allstate that included MedPay coverage of $2000." (Id. ¶ 57). "Afterward, [d]efendant WakeMed generated a list of undiscounted charges against [p]laintiff Bertolo totaling $8,571.60 for her emergency room treatment that day." (Id. ¶ 60). "On November 4, 2019, [d]efendant Argos, representing itself as an agent of [defendant] WakeMed, faxed a claim on behalf of [p]laintiff Bertolo to [defendant] Allstate, stating in pertinent part: 'Attached is a fully-executed, irrevocable Assignment of Benefits and the [Uniform Billing Forms] necessary to process a claim for any MedPay/[personal injury protection] coverage." (Id. ¶ 61).

According to the complaint, "[o]n November 15, 2019, [defendant] Allstate, after intervention by [counsel for plaintiffs], issued a check for $2,000 to [d]efendant WakeMed c/o [counsel for plaintiffs], completely exhausting [p]laintiff Bertolo's MedPay coverage." (Id. ¶ 62). This allegedly made the "check worthless" to plaintiff Bertolo. (Id.).

Plaintiffs allege that defendant Argos assisted defendant WakeMed with developing the current general consent form in use, sometime after 2015. (See id. ¶ 23). A prior version of the general consent form "served to obtain patients' consent for emergency medical treatment and . . . imposed a duty upon the patient to facilitate the hospitals' reimbursement for the reasonable value of the healthcare services rendered from patients' primary health insurances." (Id.). This prior version

of the general consent form allegedly did not include any statements "about assigning medical payments ('MedPay') under an automotive insurance policy." (Id.).

## COURT'S DISCUSSION

A.    Defendants WakeMed and Argos

    1.    Standard of Review

"To survive a motion to dismiss" under Rule 12(b)(6),[5] "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).[6]

    2.    Analysis

        a.    Declaratory Judgment

Plaintiffs seek a declaration that certain provisions in the general consent forms are "illegal, void, and against public policy as a matter of law." (Compl. ¶ 106).  In particular, plaintiffs challenge and seek to strike or rescind the provisions in the general consent forms under the heading "Irrevocable Assignment of Insurance Benefits," which purport to "assign and authorize direct

---

[5]    The court addresses separately below defendant WakeMed's argument that claims against it brought by plaintiffs Justin Palmer and Janine Palmer should be dismissed for lack of jurisdiction under Rule 12(b)(1).

[6]    Throughout this order, in citations to appellate court decisions, internal quotation marks and citations are omitted unless otherwise specified.

payment of all surgical and medical benefits" to defendant WakeMed, including as pertinent here, "medpay" benefits in automobile insurance policies (hereinafter, the "assignment of benefits"). (Compl. ¶¶ 82-86, 90-91; Ex. 2. (DE 65-3) at 1).[7]

Under the Declaratory Judgment Act, "[i]n a case of actual controversy within this court's jurisdiction," this court "upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a). "[A] district court is obliged to rule on the merits of a declaratory judgment action when declaratory relief will serve a useful purpose in clarifying and settling the legal relations in issue, and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 594 (4th Cir. 2004). In this manner, a declaratory judgment claim regarding the validity of a contract may serve "several useful purposes" in clarifying and settling defendants' legal obligations under the general consent form "eliminat[ing] uncertainty regarding those agreements, and it clarif[ying] the contractual rights of the parties." Id.

Under North Carolina law, "[t]he essence of any contract is the mutual assent of both parties to the terms of the agreement so as to establish a meeting of the minds." Snyder v. Freeman, 300 N.C. 204, 218 (1980). "By affixing her signature to the document," the signing party "manifest[s] her assent to enter into [a written] contract." Branch Banking & Tr. Co. v. Creasy, 301 N.C. 44, 53 (1980). "Freedom of contract, unless contrary to public policy or prohibited by statute, is a fundamental right included in our constitutional guaranties." Allstate Ins. Co. v. Shelby Mut. Ins. Co.,

---

[7]    Plaintiffs also seek, in passing, rescission of provisions in the general consent forms under the headings "Overpayments and Refunds" and "Assertion of Lien." (Compl. ¶¶ 85, 90, 106, Ex. 2 (DE 65-3) at 1). Plaintiffs, however, have not alleged they were injured due to operation of such provisions, nor have plaintiffs demonstrated a basis for invalidity or illegality of such provisions based upon the facts alleged. Accordingly, to the extent plaintiffs seek relief on the basis of provisions other than the assignment of benefits in the general consent, plaintiffs' claims on that basis must be dismissed.

269 N.C. 341, 345-46 (1967). Where "the contractual provision is, as related to the facts of this case, a valid one, the parties are entitled to have it enforced as written," and the court "cannot ignore any part of the contract." Id.

Here, the general consent manifests mutual assent by each plaintiff to its terms, including the assignment of benefits, through their signature to the attestation at the conclusion of the form. (See Compl. Exs. 4, 5, 7). In addition, the terms of the assignment of benefits are clear and unambiguous, in that each plaintiff agrees to "assign and authorize direct payment of all surgical and medical benefits," defined to include "medpay" benefits. (Compl. Ex. 2 at 1). Thus, "there is no reason it should not be valid," where it assigns a claim for payment using language akin to other assignments upheld as valid under North Carolina law. Charlotte-Mecklenburg Hosp. Auth. v. First of Georgia Ins. Co., 340 N.C. 88, 91 (1995); see, e.g., Barnard v. Johnston Health Servs. Corp., 270 N.C. App. 1, 2 (2020) (affirming dismissal of claims challenging assignment of benefits executed by emergency room patient as part of hospital's "admission paperwork"); Alaimo Fam. Chiropractic v. Allstate Ins. Co., 155 N.C. App. 194, 197 (2002) (determining validity as a matter of law of provision that assigned insurance benefits, including "medical payments benefits"). Therefore, the general consent, including the assignment of benefits, is a valid and enforceable contract, on its face.

Plaintiff, nonetheless, asserts that the assignment of benefits is invalid and unenforceable on multiple grounds, which the court addresses in turn below.

i.  Consideration

Plaintiffs assert that there is a lack of consideration for the assignment of benefits. Consideration, as element of an enforceable contract, "consists of some benefit or advantage to the promisor, or some loss or detriment to the promisee." Penley v. Penley, 314 N.C. 1, 14, 332 S.E.2d 51, 59 (1985). "[T]here is consideration if the promisee, in return for the promise, does anything legal

12

which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not." Id.

Here, consideration is recited in several respects in the general consent, including the provisions for assignment of benefits. In particular, the general consent expressly states that the assignment of benefits is "in consideration of health care services provided." (Compl. Ex. 2 at 1). It further describes such health care services as "all medical treatment and other health care that my physician(s) or other caregivers consider necessary, which may include diagnostic, radiology, and laboratory procedures provided to me at any WakeMed location." (Id.). In addition, with respect to assignment of benefits and other payment processing, it provides that that defendant WakeMed "will seek . . . direct payment from any potential insurer or other payment source," and "as necessary, to endorse benefit checks made payable to" the patient. (Id.). These provisions, taken together, demonstrate as a matter of law that WakeMed is undertaking activities which it is not otherwise bound to do, thereby providing consideration for the general consent and the assignment of benefits.

Plaintiffs argue that defendant WakeMed already has a duty under the Emergency Medical Treatment and Labor Act to "provide emergency treatment" such that it has provided no consideration for the assignment of benefits. (Compl. ¶ 101). The general consent, however, encompasses services that are broader in scope than what is required by the Emergency Medical Treatment and Labor Act.

The Emergency Medical Treatment and Labor Act "imposes two main obligations on hospitals with emergency rooms." Williams v. Dimensions Health Corp., 952 F.3d 531, 534 (4th Cir. 2020). First, it "requires a hospital to screen an individual to determine whether he has an emergency medical condition." Id. (citing 42 U.S.C. § 1395dd(a)).[8] Second, it "requires a hospital to stabilize

---

[8]     In particular, § 1395dd(a) provides:

     In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made

13

an individual's emergency medical condition in certain limited circumstances." Id. (citing §
1395dd(b)(1)).[9] Critically, "the stabilization requirement only sets forth standards for transferring a
patient in either a stabilized or unstabilized condition." Id. at 535. "By its own terms, the statute does
not set forth guidelines for the care and treatment of patients who are not transferred." Id. "[S]hould
a hospital determine that it would be better to admit the individual as an inpatient, such a decision
would not result in a transfer or a discharge, and, consequently, the hospital would not have an
obligation to stabilize" under the Emergency Medical Treatment and Labor Act. Id. In sum, a
hospital's Emergency Medical Treatment and Labor Act "obligations end once a patient is admitted
for treatment." Id. at 537.

The general consent extends beyond the narrow requirements of the Emergency Medical
Treatment and Labor Act. As noted, the general consent describes "provision of all medical treatment
and other health care" that "caregivers consider necessary," as well as "health care services provided,"
(Compl. Ex. 2 at 1), which are not limited, as the Emergency Medical Treatment and Labor Act is, to
screening for an emergency condition, or stabilizing for a transfer. See 42 U.S.C. § 1395dd. Indeed,

---

on the individual's behalf for examination or treatment for a medical condition, the hospital must
provide for an appropriate medical screening examination within the capability of the hospital's
emergency department, including ancillary services routinely available to the emergency department,
to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)
of this section) exists.

[9]     Section 1395dd(b)(1) provides:

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the
hospital determines that the individual has an emergency medical condition, the hospital must provide
either--

(A) within the staff and facilities available at the hospital, for such further *535 medical examination
and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this
section.

the general consent contemplates services "for up to two years." (Compl. Ex. 2 at 1). It includes within its scope services for "radiology imaging . . . and other treatment as agreed with my practitioner," related to a pregnancy. (Id.). It addresses responsibility for payment of "charges not . . . covered by any insurer for any reason, including a determination that they were not medically necessary." (Id.).

In addition, and in the alternative, the assignment of benefits is supported by consideration in the form of the procedures and methods by which defendant WakeMed provides for billing and collection of payment from third parties, which defendant WakeMed does not have a duty to employ. This includes the provision that defendant WakeMed "will seek . . . direct payment from any potential insurer or other payment source," and "as necessary, to endorse benefit checks made payable to" the patient. (Id.) (emphasis added).

In sum, plaintiffs' argument that the assignment of benefits lacks consideration fails as a matter of law.

        ii.     Medicare

Plaintiffs argue that the assignment of benefits is invalid and unenforceable, as a matter of law, because it "is strictly forbidden under Medicare and federal law," at least as it applies to plaintiffs Bertolo and Elrod. (Pl's Resp. (DE 103) at 7).[10]  For the reasons stated below, however, plaintiffs' argument fails as a matter of law.

As an initial matter, Medicare does not forbid a provider such as WakeMed from contracting with a patient to obtain an assignment of benefits, as WakeMed received from plaintiffs here. If anything, it encourages the practice, by requiring providers to collect payments first from other

---

[10]     Plaintiffs do not allege in the complaint that plaintiffs Bertolo and Elrod are Medicare beneficiaries, although they did allege this in their original complaint. (See DE 1-2 ¶¶ 28, 34). Nevertheless, where plaintiffs' argument in opposition to the defendants' motion is premised upon this assumption, the court assumes for purposes of resolving plaintiffs' argument that they are Medicare beneficiaries. (See, e.g., Pl's Resp. (DE 103) at 7) ("Plaintiffs Elrod and Bertolo received their health insurance through Medicare.").

insurers before obtaining payment from Medicare. By its terms, Medicare is a "secondary payer," which means that payment by Medicare for medical services rendered cannot be made if "payment . . . can reasonably be expected to be made . . . under an automobile or liability insurance policy or plan." 42 U.S.C. § 1395y(b)(2)(A)(ii).

This statutory provision, enacted in 1980 as part of the Medicare Secondary Payer Act, was intended "to address ballooning medical entitlement costs." Netro v. Greater Baltimore Med. Ctr., Inc., 891 F.3d 522, 524 (4th Cir. 2018). "Before the legislation went into effect, Medicare would pay for all medical treatment within its ambit, even if a private party such as an insurer was also responsible." Id. The Medicare Secondary Payer Act "inverted that system and made Medicare an entitlement of last resort, available only if no private party was liable." Id. As one of the "[b]asic commitments" provided in Medicare regulations, a provider agrees to "maintain a system that, during the admission process, identifies any primary payers other than Medicare, so that incorrect billing and Medicare overpayments can be prevented," and "[t]o bill other primary payers before Medicare." 42 C.F.R. § 489.20(f)-(g).

As such, by contracting to assign benefits payable from a primary insurer, defendant WakeMed is not engaging in conduct prohibited by Medicare, but rather conduct that furthers the central purposes of the Medicare Secondary Payer Act.

Plaintiffs assert, nonetheless, that the assignment of benefits violates a separate provision of Medicare, particularly 42 U.S.C. § 1395a, applicable to "private contracts" with a Medicare beneficiary. (Pl's Opp. (DE 103) at 9). That provision applies in circumstances in which "a physician or practitioner . . . enter[s] into a private contract with a medicare beneficiary for any item or service – (A) for which no claim for payment is to be submitted under this title, and (B) for which the

physician or practitioner receives . . . no reimbursement under this title." 42 U.S.C. § 1395a(b)(1).

If such a private contract is used, it must include provisions that the beneficiary:

> (i) agrees not to submit a claim (or to request that the physician or practitioner submit a claim) under this subchapter for such items or services even if such items or services are otherwise covered by this subchapter;
>
> (ii) agrees to be responsible, whether through insurance or otherwise, for payment of such items or services and understands that no reimbursement will be provided under this subchapter for such items or services;
>
> (iii) acknowledges that no limits under this subchapter . . . apply to amounts that may be charged for such items or services; [and] . . .
>
> (v) acknowledges that the medicare beneficiary has the right to have such items or services provided by other physicians or practitioners for whom payment would be made under this subchapter.

42 U.S.C. § 1395a(b)(2)(B). In addition, such private contract must be accompanied by an affidavit of the provider stating that the provider "will not submit any claim under this subchapter for any item or service provided to any medicare beneficiary" for a two year period. § 1395a(b)(3)(B). Finally, such private contract cannot be "entered into at a time when the medicare beneficiary is facing an emergency or urgent health care situation." § 1395a(b)(2)(A).

Although the United States Court of Appeals for the Fourth Circuit has not interpreted these "private contract" provisions in § 1395a, another court of appeals has opined that this provision, in effect, "provides that, for certain medical services, a doctor may not contract with a Medicare beneficiary <u>outside of Medicare</u> unless the doctor agrees to abstain from participating in the Medicare program for two years." <u>United Seniors Ass'n, Inc. v. Shalala</u>, 182 F.3d 965, 966–67 (D.C. Cir. 1999) (emphasis added). "[A] doctor who enters into a section [1395a] private contract with even a single patient is barred from submitting a claim to Medicare on behalf of any patient for a two-year period." <u>Id.</u> In addition, "[i]n broad terms, Medicare Part A, . . . covers care provided by institutional health

care providers including hospitals," whereas "Medicare Part B, which is the focus [of § 1395a], covers medical services including those provided by physicians." Id. at 967.

Contrary to plaintiffs' argument, § 1395a is inapposite. Critically, there is no allegation in the complaint that, in contracting with plaintiffs for an assignment of benefits, defendants were "entering into a private contract . . . for any item or service" either (A) "for which no claim for payment is to be submitted under" Medicare, or (B) "for which the physician or practitioner receives no reimbursement under" Medicare. 42 U.S.C. § 1395a(b)(1). In addition, the general consent, including the assignment of benefits, does not state anywhere that the healthcare services provided are not to be submitted under Medicare or not to be reimbursed under Medicare, or in any respect "outside of Medicare." United Seniors Ass'n, 182 F.3d at 966. To the contrary, it expressly states, on behalf of the patient, "I certify that the information provided in applying for payment under Medicare, Medicaid, or any other government programs or insurance benefits is complete and accurate in all respects." (Compl. Ex. 2 at 1) (emphasis added).

Furthermore, plaintiffs themselves assert that a prior version of the general consent was a "valid general consent form that performed functions required and permissible by law." (Compl. ¶ 23) (emphasis added). The differences between the prior version and the present challenged version of the general consent do not serve to transform the general consent into a "private contract" for services outside of Medicare under § 1395a(b)(1). Notably, the prior version of the consent form included an "Assignment of Insurance Benefits and Guaranty of Payment," and it "authorize[d] payment of hospital insurance, government or other third party payor benefits, including major medical, directly to WakeMed." (Compl. Ex. 1 (DE 65-2)). While plaintiffs allege that the prior "general consent form said nothing about assigning medical payments ('MedPay') under an automotive insurance policy," (Compl. ¶ 23), this is a difference without any material impact on

18

whether the present general consent is a "private contract" for services "outside of Medicare." 42 U.S.C. § 1395a(b)(1); United Seniors Ass'n, 182 F.3d at 966, 968. Both the prior and current general consent by their terms extend to services for which claims may be submitted to Medicare, as secondary payer, pursuant to the requirements of § 1395y(b)(2)(A).

Plaintiffs argue that the "private contract" provisions in § 1395a apply to defendant WakeMed because the general consent encompasses "all physicians or other practitioners involved" in patient care. (Compl. Ex. 2 at 1; see Surreply (DE 112) at 4; Proposed Sur-sur-sureply (DE 117-1) at 7).[11] As such, plaintiffs suggest, defendant WakeMed, including all of its component defendant entities, provided medical services under "Medicare Part B." (Surreply at 4). However, even if the general consent may fairly be interpreted to encompass services falling under Medicare Part B,[12] this does not serve to transform the general consent into a "private contract" "outside of Medicare" subject to the restrictions of § 1395a(b)(1). Id., at 968. Indeed, the former general consent form, which plaintiffs admit was "valid," also applied to "independent physicians or other independent health care professionals involved." (Compl. ¶ 23; Compl. Ex. 1 at 1).

Plaintiffs also suggest that a Medicare regulation, 42 C.F.R. § 405.415, setting forth "[r]equirements of the private contract," supports treatment of the general consent form as a private contract under § 1395a(b)(1). However, that regulation merely tracks the language of the statute in enumerating the components that must be present for a private contract, e.g., § 405.415(e) and

---

[11]     While the court does not condone the practice of seeking leave to file a sur-sur-surreply, the court has reviewed the substance plaintiffs' proposed sur-sur-surreply as part of considering whether leave should be granted. Thus, as a practical matter, the court already has taken into account plaintiffs' proposed sur-sur-surreply in determining the instant motions to dismiss. Accordingly, plaintiffs' motion for leave (DE 117) is granted.

[12]     The court recognizes, but does not resolve, defendants' argument that plaintiffs do not allege any services by individual physicians in the complaint, which are necessary for bringing Medicare Part B into application. United Seniors Ass'n, 182 F.3d at 967.

19

§1395a(b)(1)(B)(i), none of which are reasonably inferable from the plain terms of the general consent here. (See Compl. Ex. 2 at 1).

In sum, plaintiffs' claim that the assignment of benefits is illegal fails as a matter of law.

        iii.     Unconscionability

Plaintiffs argue that the assignments of benefits are void because of unconscionability, in light of their terms and the emergency circumstances in which they were executed.

Under North Carolina law, a "court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 213 (1981). "A party asserting that a contract is unconscionable must prove both procedural and substantive unconscionability." King v. Bryant, 369 N.C. 451, 459 (2017). "[P]rocedural unconscionability involves bargaining naughtiness in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power." Tillman v. Commercial Credit Loans, Inc., 362 N.C. 93, 102 (2008). "Substantive unconscionability, on the other hand, refers to harsh, one-sided, and oppressive contract terms." Id.

The procedural/substantive analysis is "more of a sliding scale than a true dichotomy," and a finding of unconscionability "may be appropriate when a contract presents pronounced substantive unfairness and a minimal degree of procedural unfairness, or vice versa." Id. Ultimately, the question is whether the contract is "so one-sided that the contracting party is denied any opportunity for a meaningful choice" and whether the "terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." Brenner, 302 N.C. at 213.

Here, plaintiffs fail to allege facts permitting an inference of unconscionability. In particular, plaintiffs have not alleged any substantive unconscionability, because the assignment of benefits is valid in substance, it performs functions permitted by law, and it is consistent with the purposes of Medicare, based on the foregoing analysis of its substantive terms. Because they have been upheld as a valid mechanism for payment in the medical billing context, the assignment of benefits' terms are not "so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." Brenner, 302 N.C. at 213; see Charlotte-Mecklenberg, 340 N.C. at 91; Barnard, 270 N.C. App. at 2; Alaimo, 155 N.C. App. at 199. Further, the assignment of benefits is not harsh and one-sided where it serves a useful purpose to both parties in streamlining collection of payments from primary payers. Plaintiffs' claim of unconscionability thus fails based upon the absence of substantive unconscionability alone.

Plaintiffs argue that Charlotte-Mecklenberg and Alaimo are distinguishable and irrelevant because they do not involve "assignments entered into while the patients were experiencing a medical emergency at a hospital emergency room." (Pl's Opp. (DE 103) at 19). This distinction, however, is beside the point on the issue of substantive unconscionability, which considers the terms of the assignments rather than the circumstances of their execution. Similarly unavailing is plaintiffs' reliance upon Ratino v. Med. Serv. of D.C., No. R-79-952, 1981 WL 2097, at *6 (D. Md. June 30, 1981), wherein the court observed that "it is doubtful that a patient in an emergency room situation can be expected to be capable of understanding and assenting to fee and collection forms in light of the physical, emotional and mental state which can be anticipated in many, if not all such patients." Ratino did not address both prongs of unconscionability under North Carolina law, and it couched its analysis the context of a cause of action under the Sherman Antitrust Act.

In any event, plaintiffs also have not alleged sufficiently procedural unconscionability to tip the sliding scale in their favor to state a claim based upon unconscionability. Procedural circumstances upon presentation in the emergency room, as alleged by plaintiffs, (see Compl. ¶¶ 56, 65, 76-77), are the same that would have been experienced by patients executing the prior general consent form, which plaintiffs allege was "valid," despite the same setting. (Compl. ¶ 23). Moreover, plaintiffs have not alleged sufficiently "bargaining naughtiness in the form of unfair surprise," Tillman, 362 N.C. at 102, where the assignment of benefits here is included in the context of other related provisions for payment collection and guaranties. (See Compl. Ex. 2 at 1); Cf. King, 369 N.C. at 456 (discussing arbitration agreement signed upon medical intake, which "differed from all of the other forms because it did not concern medical information, insurance information, or payment for the surgery, all routine for a new patient").

In sum, plaintiffs' claim based upon unconscionability fails as a matter of law.

iv.    Additional Invalidity Grounds

Plaintiffs assert several additional grounds for invalidating the assignment of benefits, including mistake, fraud, undue influence, and diminished mental capacity. None of these grounds, however, are supported by the allegations in the complaint.

"In order for the remedy of rescission to be operable because of mistake of fact, there must be mutual mistake of fact." Marriott Fin. Servs., Inc. v. Capitol Funds, Inc., 288 N.C. 122, 136, 217 S.E.2d 551, 560 (1975). "A unilateral mistake, unaccompanied by fraud, imposition, undue influence, or like oppressive circumstances, is not sufficient to avoid a contract or conveyance." Id. The elements of fraud are: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Ragsdale v. Kennedy, 286 N.C. 130, 138 (1974). The "circumstances"

of a fraud claim that must be pled with particularity include "the time, place, and contents of the false representations, as well as the identity of the person making the representations and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir.1999). In addition, "[r]easonable, detrimental reliance upon a misrepresentation is an essential element of a cause of action for fraud . . . and such reliance must be pled with particularity." Learning Works, Inc. v. The Learning Annex, Inc., 830 F.2d 541, 542 (4th Cir.1987). "[U]ndue influence, . . . is a fraudulent influence, or such an overpowering influence as amounts to a legal wrong." In re Turnage's Will, 208 N.C. 130, 130 (1935). "[A]n essential element of duress is a [w]rongful act or threat." Link v. Link, 278 N.C. 181, 194 (1971).

Here, plaintiffs have not alleged facts sufficient to permit a reasonable inference of unilateral mistake through fraud, undue influence, or duress. First, plaintiffs do not allege with particularity the identity of any individual who concealed facts that they had a duty to affirmatively disclose to plaintiffs. Plaintiffs allege, rather, that "none of the hospital's employees pointed out, informed, told, or otherwise indicated to Plaintiffs that they were signing away their rights to their Med Pay under their separate automotive insurance contracts." (Compl. ¶ 91). Plaintiffs do not, however, allege that any individual had a duty to inform plaintiffs of this provision which was written in the contract that plaintiffs signed. Davis, 256 N.C. at 472; Williams v. Williams, 220 N.C. 806, 18 S.E.2d 364, 366 (1942) (holding that "in the absence of a showing that [plaintiff] was wilfully misled or misinformed by the defendant as to these contents, or that they were kept from him in fraudulent opposition to his request, he is held to have signed with full knowledge and assent as to what is therein contained").

Second, plaintiffs do not allege with particularity that defendants, or any individual employee, intended for plaintiffs to rely upon a concealed fact, or that plaintiffs relied upon the concealment of the fact in executing the general consents with the assignment of benefits. As for plaintiffs Bertolo

and Elrod, they allege that if they had been aware of the assignment of benefits, "they would not have known what to do." (Compl. ¶ 91.a). As for plaintiff Palmer, they allege "she would have signed anything" notwithstanding any additional information about assignment of benefits. (Compl. ¶ 91.b). As such plaintiffs have not alleged reliance with particularity as to any of them.

Third, plaintiffs do not allege facts necessary to state a claim for undue influence and duress. Plaintiffs allege, for example, that plaintiff "Bertolo was directed to sign numerous documents and forms that were visible only on the WakeMed employee's computer screen, whereby the employer briefly mentioned to Plaintiff Bertolo what each form was, and directed her to sign by way of an electronic signature pad." (Compl. ¶ 58). Such alleged "direct[ion]" by a WakeMed employee does not give rise to a plausible inference of "overpowering influence as amounts to a legal wrong" or "a [w]rongful act or threat" by defendants, or their employees, prior to plaintiffs' execution of the general consents. Turnage, 208 N.C. at 130; Link, 278 N.C. at 194; see, e.g., Williams, 18 S.E.2d at 366 (looking to whether plaintiff "was willfully misled or misinformed," or that contents "were kept from him in fraudulent opposition to his request").

Finally, plaintiffs do not allege diminished mental capacity sufficient to support rescission of the assignment of benefits. Under North Carolina law, "a person has mental capacity sufficient to contract if he knows what he is about, and . . . the measure of capacity is the ability to understand the nature of the act in which he is engaged and its scope and effect, or its nature and consequences, not that he should be able to act wisely or discreetly, nor to drive a good bargain, but that he should be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly." Sprinkle v. Wellborn, 140 N.C. 163, 52 S.E. 666, 672 (1905). Generally, an incompetent adult is one "who lacks sufficient capacity to manage the adult's own affairs or to make or communicate important decisions concerning the adult's person, family, or property whether the

24

lack of capacity is due to mental illness, intellectual disability, . . . disease, injury, or similar cause or condition." N.C. Gen. Stat. § 35A-1101.

Here, plaintiffs do not allege conditions that rendered them incompetent to make or communicate important decisions concerning themselves, or family, in the case of Janine Palmer. Plaintiff Bertolo allegedly "was in severe pain, reported a foggy memory surrounding the [motor vehicle accident] and uncertainty as to whether she had lost consciousness as a result of the collision." (Compl. ¶ 56). Plaintiff Elrod allegedly "was terrified and in a panicked state because of potential internal bleeding complications." (Compl. ¶ 65). Plaintiff Janine Palmer "was in a state of complete panic" and "anxiety" that was "greatly intensified" by the presence of a "Clergyman into the room while [she] was signing the documents." (Compl. ¶¶ 76-77). While the court reasonably may infer an extreme level of pain, stress, urgency, and anxiety, on the part of plaintiffs, none of these allegations permit an inference that plaintiffs did not "know[] what [s]he is about," "understand the nature of the act in which [s]he is engaged," "at least what [s]he is doing" or "make or communicate important decisions concerning the adult's person [or] family." Sprinkle, 52 S.E. at 672; N.C. Gen. Stat. § 35A-1101. Accordingly, plaintiffs' assertion of diminished mental capacity fails as a matter of law.

In sum, plaintiffs fail to state a claim for declaratory judgment on the basis that the assignment of benefits is invalid, illegal, void, or otherwise subject to rescission on the basis of mistake, fraud, undue influence, duress, or diminished capacity.[13] Therefore, plaintiffs' claim for declaratory judgment must be dismissed for failure to state a claim upon which relief can be granted.[14]

---

[13] For the same reasons, plaintiffs' separate claim for fraud and fraud in the inducement against defendants WakeMed and Argos fails as a matter of law and must be dismissed.

[14] Defendant Argos suggests in the conclusion of its memorandum in support of its motion to dismiss that declaratory relief should be granted in favor of defendant Argos. Defendant Argos, however, has not brought a separate claim for declaratory relief against plaintiffs, nor has it suggested a form of declaratory relief. Accordingly, where

b.      Breach of Fiduciary Duty

Plaintiffs assert a claim for breach of fiduciary duty against defendant WakeMed, on the basis that they had a physician-patient fiduciary relationship, which defendant WakeMed allegedly breached by obtaining plaintiffs' signatures on the general consents.

"For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." King v. Bryant, 369 N.C. 451, 464 (2017). "A number of relationships have been held to be inherently fiduciary, including the relationships between . . . physician and patient." Id. "However, the relation . . . exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Id. At bottom, "fiduciary relationships are characterized by a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party." Id.

"If a fiduciary relationship is found to exist, the fiduciary is held to a standard stricter than the morals of the market place[;] not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Id. at 465. "Liability for breach of fiduciary duty is based on the taking advantage of a confidential relationship rather than a specific misrepresentation." Id. "[W]here a relation of trust and confidence exists between the parties, there is a duty to disclose all material facts and failure to do so constitutes a breach of fiduciary duty." Id.

For purposes of the instant analysis, the court presumes that plaintiffs have alleged that defendant WakeMed and plaintiffs maintained a fiduciary relationship, at the point where plaintiffs presented themselves for emergency medical treatment and consented to such treatment. See King, 369 N.C. at 466 (holding, as between a physician and a patient, "at the time that the arbitration

_____

plaintiffs' declaratory judgment claim against defendant Argos is subject to dismissal for failure to state a claim, the court declines in its discretion to make a separate award of declaratory relief to defendant Argos.

agreement was signed, there was a confidential relationship between them at that point" akin to a fiduciary relationship).[15]

Plaintiffs have not, however, alleged a breach of a duty arising from that fiduciary relationship through defendant WakeMed's assignment of benefits. Like a guaranty of payment, or an authorization to act as an attorney-in-fact, the assignment of benefits comprises a valid means of payment collection for plaintiffs' treatment. It is contained within the general consent form signed by plaintiffs, within a section commencing with a bold heading, "Irrevocable Assignment of Insurance Benefits." (Compl. Exs. 2 & 7 at 1). In this respect, the assignment of benefits stands in contrast to the physician's arbitration agreement found invalid in King, which was one of a number of documents presented, and which "differed from all of the other forms because it did not concern medical information, insurance information, or payment for the surgery, all routine for a new patient." King, 369 N.C. at 456 (emphasis added). There, the arbitration agreement was notably different from other intake documents because it "sought to foreclose [the patient's] access to the judicial process in the event that any dispute arose out of or related to the surgery to be performed." Id.

In sum, because the assignment of benefits is akin to a form for insurance information or for payment for medical treatment, defendant WakeMed did not breach a fiduciary duty by including it within the general consent and failing to draw further attention to it or to explain its terms to plaintiffs. Therefore, plaintiffs' breach of fiduciary duty claim fails as a matter of law.[16]

---

[15]   The court recognizes, but does not resolve, defendant WakeMed's argument that "no North Carolina court has ever found a fiduciary relationship in law or fact between an individual and a hospital related to the hospital's pricing, billing, or collection functions." (Def's Mem. (DE 84) at 19).

[16]   For the same reasons, plaintiffs' claim for constructive fraud against defendants WakeMed and Argos must be dismissed. See King, 369 N.C. at 465 ("The elements of a claim for breach of fiduciary relationship are the same as those for constructive fraud."). Where plaintiffs assert in part a constructive fraud claim against defendant Argos for its separate conduct "[s]ubsequent to treatment," (Compl. ¶ 126), plaintiffs have alleged no duty on the part of Argos with respect to its payment collection activities. Plaintiffs' claims against defendant Argos fail for this additional reason.

27

c.     Conversion

Plaintiffs assert a conversion claim against defendants WakeMed and Argos.  Conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 523 (2012).  Here, where plaintiffs claims challenging the validity of the assignment of benefits fail as a matter of law, plaintiffs cannot establish the "unauthorized" element of the tort of conversion.  Id.  Accordingly, plaintiffs' conversion claim is dismissed.

d.     Unfair and Deceptive Trade Practices

Plaintiffs assert an unfair and deceptive trade practices claim against defendants WakeMed and Argos.  North Carolina law declares as unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

Plaintiffs' unfair and deceptive trade practices claim fails for two reasons.  First, courts "differentiate between contract and deceptive trade practice claims, and relegate claims regarding the existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement to the arena of contract law." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998) (quotations omitted).  Here, where a valid contract governs the relationship between plaintiffs and defendant WakeMed, and where defendant Argos is alleged to have acted on behalf of WakeMed under the contract, the rights and remedies of the parties lie in contract law and not in unfair and deceptive trade practices.  See id.

Second, where plaintiffs' claims based in fraud and contract invalidity claims fail as a matter of law, plaintiffs unfair and deceptive trade practices asserted based upon the same underlying

28

conduct also must be dismissed. See id. (stating "North Carolina law requires a showing of substantial aggravating circumstances to support a claim" for unfair and deceptive trade practices).

In sum, plaintiffs fail to state a claim upon which relief can be granted. Therefore, the court grants the motions to dismiss by defendants WakeMed and Argos, pursuant to Rule 12(b)(6), and plaintiffs' claims against them are dismissed.[17]

B.    Defendants Allstate and Penn National

Dismissal of defendants Allstate and Penn National is warranted for two reasons. First, the facts alleged do not "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." White v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 913 F.2d 165, 168 (4th Cir. 1990). Plaintiffs do not seek any relief from defendants Allstate and Penn National, nor do they assert that Allstate and Penn National have breached any terms of their automobile insurance policies with plaintiffs. Accordingly, plaintiffs do not allege an "actual controversy" with defendants Allstate and Penn National to permit exercise of the court's jurisdiction against them under the Declaratory Judgment Act. 28 U.S.C. § 2201(a).

Second, where plaintiffs' declaratory judgment claim fails as a matter of law, for the reasons stated above, and where defendants Allstate and Penn National have not brought a claim for separate relief in the form of a declaratory judgment in their favor, the declaratory judgment claim properly is dismissed for failure to state a claim upon which relief can be granted.

---

[17]    In addition, defendant WakeMed seeks dismissal pursuant to Rule 12(b)(1) of claims asserted by plaintiffs Janine Palmer and Justin Palmer, on the basis of a lack of Article III standing, where defendant WakeMed asserts their "medpay proceeds were paid to someone else." (Mem. (DE 84) at 5). However, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." Bostic v. Schaefer, 760 F.3d 352, 370 (4th Cir. 2014); see Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018). Accordingly, dismissal on the basis of Article III standing is not warranted here. Rather, the lack of any alleged payment to WakeMed under the terms of the assignment of benefits executed by Janine Palmer (see Compl. ¶ 80), provides an additional basis for dismissing claims brought by plaintiffs Janine Palmer and Justin Palmer, for failure to state a claim. The court likewise does not reach defendant WakeMed's preemption arguments.

## CONCLUSION

Based on the foregoing, defendants' motions to dismiss (DE 73, 75, 81, 83) are GRANTED. Plaintiffs' claims against defendants WakeMed and Argos are DISMISSED pursuant to Rule 12(b)(6). Plaintiffs' claims against defendants Allstate and Penn National are DISMISSED pursuant to Rule 12(b)(1) and 12(b)(6). Plaintiffs' motion for leave to file sur-sur-sureply (DE 117) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 22nd day of September, 2021.

_____
LOUISE W. FLANAGAN
United States District Judge